FILED

August 12 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0253

DA 14-0253

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 240

ROBERT W. ANDERSON,

        Plaintiff and Appellant,

    v.

BNSF RAILWAY, a Delaware Corporation,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDV-08-1681
Honorable Kenneth R. Neill, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Erik B. Thueson (argued), Thueson Law Office; Helena, Montana

        Dennis Conner, Keith Marr, Conner & Marr; Great Falls, Montana

        James T. Towe, Towe & Fitzpatrick; Missoula, Montana

    For Appellee:

        Jeff Hedger, Benjamin O. Rechtfertig (argued), Hedger Friend, PLLC;
Billings, Montana

    For Amicus Curiae Montana Trial Lawyers Association:

        James P. Carey, Lamb & Carey; Helena, Montana

    For Amicus Curiae Association of American Railroads:

        Anthony Nicastro, Hall & Evans, LLC; Billings, Montana

                        Argued:  January 28, 2015
                  Submitted:  February 11, 2015
                  Decided:  August 12, 2015

Filed:

                                 _____
                                        Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1      Plaintiff, Robert Anderson, appeals from a judgment of the Eighth Judicial District Court, Cascade County, following a jury verdict against Anderson and in favor of BNSF Railway Company.  We reverse and remand for a new trial.

¶2      We restate the issues on appeal as follows:

> 1. *Should the District Court have decided the statute of limitations question as a matter of law?*
>
>> a. *Does the continuing tort doctrine apply to cumulative trauma injuries under the FELA?*
>>
>> b. *Can an employee recover under the FELA for aggravation of a time-barred injury?*
>>
>> c. *Do non-disabling aches and pains constitute an "injury" under the FELA?*
>
> 2. *Did counsel for BNSF make improper comments that deprived Anderson of a fair trial?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3      Appellant, Robert Anderson, worked for BNSF for over 30 years.  In 2008, he sued BNSF under the Federal Employers' Liability Act, 45 U.S.C. §§ 51, et seq. (FELA).  Anderson alleged that over the course of his employment, BNSF negligently assigned him to work that caused cumulative trauma injuries to his musculoskeletal system, particularly his lower back, and that BNSF knew or should have known the work it assigned him to would cause cumulative trauma injuries.  Anderson further alleged that BNSF negligently left a hole in a walkway that Anderson stepped into, causing him to fall, and resulting in a disabling back injury.  Anderson characterizes the injury from the

2

fall as "the straw that broke the camel's back," arguing that the fall was the tipping point that pushed his cumulative trauma injury from intermittent, resolving aches and pains into a disabling injury. Anderson also alleged that when he returned to work after falling, BNSF continued to assign him to work that it knew or should have known would further aggravate his cumulative trauma injury.

¶4     Anderson worked for BNSF from 1976 to 2009, primarily as a carman inspecting and repairing railroad cars in Havre, Montana. As a carman, Anderson was required to spend multiple hours a day driving Kubota tractors with no suspension, or pickups with insufficient suspension, over rough roads and railroad crossings. Through most of his career, Anderson experienced intermittent aches and pains in his back, shoulders, neck, and wrists. Those symptoms always resolved over time, however, and did not inhibit his ability to work. Anderson sought medical attention for the pain in the years before he retired, but was not diagnosed with a potentially disabling injury until 2008. In March 2006, Anderson's supervisor learned that Anderson was seeking medical attention for pain in his wrists, arms, and shoulders. The supervisor instructed Anderson to submit an injury/occupation illness report documenting the pain. A few days later, Anderson filed a report, stating that he was unaware of the full extent of his injuries but believed he had a rotator cuff tear, degenerative disc disease, soft tissue injuries, and tendinitis. On the form, Anderson attributed his injury or occupational illness to years of coupling air hoses, riding the Kubota tractors with no suspension over rough roads, lifting parts to the side, overhead, and in awkward positions, as well as other job-related tasks. Anderson wrote that he first noticed the symptoms in January 2005. BNSF did not make any changes to

Anderson's work assignments, equipment, or work conditions after receiving the injury/occupational illness report.

¶5 Anderson's primary claim at trial was that the jolting and vibration from driving the tractors and trucks over poorly maintained roads caused cumulative trauma to his lower back, resulting in a back disorder. According to the federal Occupational Safety and Health Administration (OSHA):

> Back disorders can develop gradually as a result of a microtrauma brought about by repetitive activity over time. . . . Because of the slow and progressive onset of this internal injury, the condition is often ignored until the symptoms become acute, often resulting in disabling injuries. . . . While the acute injury may seem to be caused by a single well-defined incident, the real cause is often a combined interaction of the observed stressor coupled with years of weakening of the musculoskeletal support mechanism by repetitive microtrauma.

Occupational Safety & Health Administration, *OSHA Technical Manual*, § VII, Ch. 1 (1999) available at http://perma.cc/ZQ8U-7DLQ. OSHA, the National Academy of Sciences, the Center for Disease Control, and the U.S. military all recognize cumulative trauma back injuries and use a definition similar to OSHA's. The acute injury that "may seem to be caused by a single well-defined incident" but is actually caused by "a combined interaction of the observed stressor coupled with years of weakening of the musculoskeletal support mechanism by repetitive microtrauma" is characterized throughout literature on cumulative trauma disorders as "the straw that broke the camel's back."

¶6 At trial, Anderson presented safety manuals produced from BNSF's files. These manuals were published by the trade organization, the Association of American

4

Railroads, to which BNSF belongs. According to these publications, cumulative trauma accounted for over 60% of all railroad employee injuries. Safety audits in the 1980s revealed that numerous BNSF workers suffered from cumulative trauma injuries. One major audit noted that riding inspection tractors over rough roads caused shock and vibration to employees' musculoskeletal systems, resulting in back pain and injuries. In 1993, BNSF's chief safety expert issued a memo regarding ergonomics training which noted that as much as 40% of on-the-job injuries suffered by BNSF employees were caused by "the straw that broke the camel's back" cumulative trauma situations. The BNSF safety expert identified the "seven no nos" that caused cumulative trauma injuries, including: excessive repetitive motion; excessive forces being exerted by the body and its individual parts; pressure on muscles, tendons, nerves, or blood vessels; and vibration of the body or body parts.

¶7     Anderson presented evidence at trial that BNSF employees complained for decades that the vehicles and rough roads caused frequent pain, primarily to employee's backs, but BNSF neither investigated the complaints, nor took action to remedy the problem. Anderson also presented evidence that hundreds of carmen reported cumulative trauma injuries similar to Anderson's and attributed to the same types of job assignments.

¶8     On December 23, 2008, Anderson stumbled and fell while working. According to Anderson, the fall resulted from a hole that was concealed by snow and lay between railroad ties on a switch. Anderson filed an injury report regarding the fall and sought medical treatment. Anderson's back worsened after the fall and his treating physician successively increased his physical restrictions. In October 2009, BNSF took Anderson

off work due to his back injury. At trial, Anderson characterized the December 23, 2008 fall as a straw-that-broke-the-camel's-back scenario from which his cumulative trauma injury manifested.

¶9 Before trial, the parties filed cross-motions for summary judgment on the issue of the statute of limitations. BNSF argued that Anderson's injury/occupational illness report from March 2006 indicated that Anderson first began experiencing symptoms of his injury and recognized that they were work-related in January 2005. BNSF argued that under the discovery rule, as applied in FELA cases, Anderson was on notice in January 2005 that he had a work-related injury and the statute of limitations began to run no later than that date. BNSF also pointed to testimony that showed Anderson was experiencing difficulty doing manual labor due to his back in 2000–2001, and a 2002 medical record stating Anderson complained of back pain and was diagnosed with degenerative disc disease. Anderson countered by pointing to his deposition in which he stated that he first noticed his symptoms in January 2005 but did not recognize that they were work-related until February 2006, when his doctor diagnosed his back condition as a work-related injury. Anderson also argued that his negligent assignment claim fell under the continuing tort theory, which tolls the statute of limitations until the tortious conduct ceases.

¶10 The District Court denied both motions for summary judgment, noting that for purposes of the discovery rule there was a factual dispute about when Anderson knew or should have known he had an injury, and the injury was work-related. The District Court

6

declined to adopt a continuing tort theory because Anderson's claim fell within the discovery rule.

¶11 The case proceeded to trial, and the jury returned a verdict finding that Anderson's cumulative trauma claim was barred by the statute of limitations. The jury also found that BNSF did not negligently cause Anderson's December 23, 2008 fall.

¶12 After the verdict, Anderson filed a motion for a new trial. Anderson argued that the statute of limitations should have been decided in his favor as a matter of law, and that he was deprived of a fair trial because he was not allowed to present his negligent work assignment theory to the jury. Anderson also argued that he was denied a fair trial because BNSF made improper statements in closing argument and interjected inadmissible evidence of collateral source benefits.

¶13 The District Court rejected all of Anderson's arguments. The District Court held that there was a factual dispute over when the statute of limitations began to run under the discovery rule, which meant the issue was properly decided by the jury. The District Court rejected Anderson's assertion that he had not been allowed to present his negligent work assignment theory to the jury, noting that nothing prevented Anderson from presenting evidence regarding negligent work assignment in either of his claims. The District Court went on, however, to state that Anderson's negligent work assignment theory was similar to a continuing tort theory, and based on its refusal to adopt a continuing tort theory, it also refused to adopt a negligent work assignment theory as it applied to damages and tolling the statute of limitations. The District Court also rejected

7

Anderson's arguments regarding improper statements in closing argument. Having rejected all of Anderson's claims, the District Court denied the motion for a new trial.

¶14 Anderson appeals the District Court's judgment.

## STANDARD OF REVIEW

¶15 We review the grant or denial of summary judgment de novo, using the same criteria used by the trial court. Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. Once the moving party has met its burden, the non-moving party must present substantial evidence essential to one or more elements of the case to raise a genuine issue of material fact. We review a question of law to determine if the district court's legal conclusions are correct. *Harris v. State*, 2013 MT 16, ¶ 11, 368 Mont. 276, 294 P.3d 382 (internal citations omitted).

¶16 We review a district court's decision to deny a motion for a new trial on the grounds enumerated in § 25-11-102, MCA, for an abuse of discretion. The decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of that discretion. The standard requires that the abuse of discretion be so significant as to materially affect the substantial rights of the complaining party. *Cooper v. Hanson*, 2010 MT 113, ¶ 28, 356 Mont. 309, 234 P.3d 59 (internal citations and quotations omitted).

## DISCUSSION

¶17 The FELA presents an esoteric area of the law for judges and practitioners not versed in its unique aspects. Therefore, some setting of the stage is necessary to

8

understand what follows. While FELA cases are tort cases, many of the usual tort rules, legal standards, and rules of statutory construction do not apply within the FELA context. As the Maryland Special Court of Appeals aptly noted:

> This appeal is from . . . a Federal Employers' Liability Act ("FELA") case. That statement may be self-explanatory to the small handful of practitioners who labor regularly, or even occasionally, in that very specialized vineyard. One strongly suspects, however, that many who speak of FELA law with breezy familiarity are only whistling past the graveyard. To the more modest vast majority of the bar (and the bench), a FELA case is essentially, if not totally, *terra incognita*. For those suddenly cast ashore on that exotic coast, it may be prudent, before plunging into the interior, to spend a few pages looking about and getting one's bearings.

*CSX Transp., Inc. v. Miller*, 858 A.2d 1025, 1028 (Md. Ct. Spec. App. 2004). The *Miller* opinion painstakingly lays out the nuances and unique features of the FELA, the source of which is nearly a century of jurisprudence establishing that the FELA is to be "liberally construed to further Congress' remedial goal." *Conrail v. Gottshall*, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1994).

¶18    As recently as 2003, the U.S. Supreme Court found it necessary to reiterate that many of the common law rules simply do not apply to FELA claims, noting: "[S]everal of the FELA's provisions expand a railroad's liability by abolishing common-law defenses that limited employees' ability to recover against their employers." *Norfolk & W. Ry. v. Ayers*, 538 U.S. 135, 161, 123 S. Ct. 1210, 1225 (2003). Examples of this expanded liability are standards of causation that are considerably more relaxed in FELA claims than are applied in most any other tort context. As the U.S. Supreme Court noted recently in *CSX Transp., Inc. v. McBride*:

9

> FELA's language on causation . . . "is as broad as could be framed." *Urie v. Thompson,* 337 U.S. 163, 181, 69 S. Ct. 1018 (1949). Given the breadth of the phrase "resulting in whole or in part from the [railroad's] negligence," and Congress' "humanitarian" and "remedial goal[s]," we have recognized that, in comparison to tort litigation at common law, "a relaxed standard of causation applies under FELA." *Gottshall,* 512 U.S., at 542–543, 114 S. Ct. 2396.

*CSX Transp., Inc. v. McBride*, ___ U.S. ___, 131 S. Ct. 2630, 2636 (2011). Under this relaxed standard of causation, "If negligence is proved . . . and is shown to have *played any part, even the slightest, in producing the injury*, . . . then the carrier is answerable in damages even if the extent of the injury or the manner in which it occurred was not probable or foreseeable." *McBride*, ___ U.S. at ___, 131 S. Ct. at 2643 (internal citations, brackets, and quotation marks omitted, emphasis in original).

¶19 The FELA thus calls for an interpretive approach that is significantly different from that which ordinarily prevails in suits involving common-law negligence claims, and the resulting interpretations often seem anomalous in comparison to the norms of tort law. Therefore, it is necessary to suspend traditional notions of conventional tort law when applying the relevant standards for FELA claims.

¶20 In addition to clarifying the unusual area of law we deal with here, we must also clarify some of the applicable terms. It appears that some confusion of terminology occurred in the proceedings below and in the parties' appellate briefs. For the sake of clarity, we define the relevant terms below.

¶21 "Cumulative trauma injury [or disorder]" refers to a type of occupational disease that:

> [develops] gradually over periods of weeks, months, or even years as a result of repeated stresses on a particular body part. The cumulative concept is based on the theory that each repetition of an activity produces some trauma or wear and tear on the tissues and joints of the body. The word "trauma" signifies bodily injury from mechanical stresses . . . [resulting in] physical ailments or abnormal conditions.

National Institute for Occupational Safety and Health, *Cumulative Trauma Disorders in the Workplace* (1995), available at http://perma.cc/9QXJ-3SWW. FELA claims alleging a cumulative trauma injury generally rely on a basic theory of negligence[1]—i.e., that the railroad had a duty to provide a safe work environment and breached that duty by assigning a worker to duties or by providing equipment that created an unreasonable risk of injury for anyone assigned to that work for long periods.

¶22 "Negligent work assignment" is a claim that may be made under the FELA which alleges that the employer assigned the employee to work that the employer knew or should have known exposed that employee to a particular risk of harm. In particular, negligent work assignment claims allege that ordinarily safe work is hazardous to a particular employee because of the employee's physical condition, and the employer was negligent in assigning the employee to that type of work because it knew or should have known of the special risk the work presented to that particular employee. The same work assignment would be non-negligent if given to an employee without the physical condition at issue. It is the employer's prior knowledge of the employee's physical

---

[1] As with any other claim under the FELA, liability in cumulative trauma injury claims may also be established by proving violations of the Safety Appliance Act (49 U.S.C. §§ 20301, et seq.) or Locomotive Inspection Act (49 U.S.C. §§ 20701, et seq.). Because Anderson did not allege violations of the SAA or LIA, our analysis for purposes of this case discusses only the railroad's alleged negligence.

11

condition that gives rise to the negligence, rather than any inherent hazard in the work. *Kichline v. Consol. Rail Corp.*, 800 F.2d 356, 361 (3d Cir. 1986); *Ex parte CSX Transp. Inc.*, 735 So.2d 476, 480 (Ala. 1999); *Walsh v. Consolidated Rail Corp.*, 937 F. Supp. 380, 386–92 (E.D. Pa. 1996).

¶23 "Aggravation," like negligent work assignment, involves an employee with a particular physical condition but alleges only that the employer's ordinary negligence aggravated an existing injury or illness. No prior knowledge of the employee's condition is required because the negligence does not arise from knowledge of the employee's condition. *Kichline*, 800 F.2d at 361. The conduct at issue in an aggravation claim would be negligent regardless of the employee affected by it. The theory speaks to the nature of the injury, rather than the theory of liability.

¶24 A "continuing tort" is not a type of claim, but rather a doctrine that tolls the statute of limitations for as long as the tortious conduct continues. The effect the doctrine has on the statute of limitations depends on which of the two versions of the theory a court adopts. The first is sometimes called a "pure" continuing tort theory and states that so long as any of the negligent conduct occurred within the limitations period, the plaintiff may recover damages for all of the negligent conduct, even the portion of it that occurred outside the limitations period. The second is sometimes called a "modified" continuing tort theory and still recognizes the negligent conduct as a single whole, rather than separate, discrete acts, but nonetheless limits recovery to that portion of the damages that falls within the limitations or "look-back" period. *White v. Mercury Marine*, 129 F.3d 1428, 1430 (11th Cir. 1997).

12

¶25    The above-defined concepts are easy to confuse in this case because all four are implicated in Anderson's claims. Anderson alleged a cumulative trauma injury based on the simple negligence theory that assigning anyone to a carman's duties for thirty years would foreseeably cause injury and argues the continuing tort doctrine should apply to such claims. He contended that if his claim accrued outside the limitations period, as BNSF argued, the continued trauma from the job tasks aggravated the injury, and the jury should have been permitted to consider damages for any negligently caused aggravation. He further contended that BNSF assigned him to work that further injured his back after he fell on December 23, 2008, and that BNSF knew his back was injured in the fall and knew or should have known that the work it was assigning him to would further injure his back, which is a negligent work assignment claim.

¶26    Both below and on appeal, Anderson did not consistently distinguish between his negligent work assignment claim and his cumulative trauma injury claim, and the confusion carried over into the District Court's order denying Anderson's motion for summary judgment on the statute of limitations issue. The two claims are distinguishable, however, because liability in negligent work assignment claims arises from the employer's knowledge of the employee's physical condition, whereas liability in cumulative trauma cases arises from continual exposure to conditions that create an unreasonable risk of an accretion of trauma that eventually manifests into an injury. The two are easily confused because the theory of liability in a cumulative trauma case is similar to the theory of liability in negligent work assignment cases—that is, the employer assigned the employee to work that could reasonably be expected to produce

13

injury. Anderson's primary claim at trial was that BNSF continually assigned him to work that it knew or should have known would cause injury in the long term. This is a cumulative trauma claim because the work assignments in cumulative trauma cases are ones that could be expected to injure *anyone* consistently assigned to them for a long period of time, while the work assignments in negligent work assignment cases are generally only hazardous to a *particular worker* because of his or her physical condition.

¶27 *Ex parte CSX Transp.*, 735 So.2d 476 illustrates the difference. In that case, the plaintiff brought a wrongful death case against the railroad after her husband died of a heart attack while working as a conductor. The plaintiff demonstrated that her husband had a heart condition, that the railroad was aware of the condition, and that it nonetheless assigned him to work that created an unreasonable risk of heart attack. Had the plaintiff argued that the cumulative effects of the job assignment would have put *anyone* at an unreasonable risk of a heart attack, the claim would have been for a cumulative trauma injury with a basic theory of negligence. However, the claim relied on a special theory of negligence under which an otherwise safe work assignment was allegedly dangerous to this particular worker because of his physical condition, and the railroad assigned him to the task despite knowing of the special risk it posed.

¶28 Anderson also alleged that BNSF continued to assign him to work that further injured his back after the December 2008 fall, despite knowing the weakened condition of his back created an unreasonable risk of further injury. That allegation made out a claim for negligent work assignment; however, Anderson did not plead it as a separate cause of action, instead treating it as part of his cumulative trauma allegations.

14

¶29 To further complicate matters, there appears to have been some confusion in the proceedings in the District Court over whether the term "negligent work assignment" referred to a type of claim under the FELA or a doctrine that tolls the statute of limitations. On appeal, Anderson refers to a "continuing negligent work assignment claim" and argues that such a claim should toll the statute of limitations for as long as the allegedly negligent work assignment continues. Anderson characterizes one of the issues on appeal as whether the District Court erred in dismissing his negligent work assignment claim. The District Court, however, did not dismiss Anderson's negligent work assignment claim; it rejected application of the continuing tort doctrine to Anderson's claim—that is, it rejected the theory that such a claim tolls the statute of limitations for as long as the negligent assignment continues. Anderson's arguments mistakenly treat negligent work assignment claims as inextricably intertwined with the continuing tort doctrine. Thus, he interpreted the District Court's refusal to apply the continuing tort doctrine to his claim as a rejection of the claim itself.

¶30 With the background, legal context, and relevant terms clarified, we turn to the issues presented on appeal.

¶31 *1. Should the District Court have decided the statute of limitations question as a matter of law?*

¶32 No action may be maintained under the FELA unless commenced within three years from the day the cause of action accrued. 46 U.S.C. § 56. In *Urie v. Thompson*, 337 U.S. 163, 69 S. Ct. 1018 (1949), the U.S. Supreme Court applied a version of the discovery rule to the FELA's statute of limitations. The plaintiff in that case, Urie,

15

developed silicosis as a result of exposure to airborne silica dust in his employment as a fireman on steam locomotives. The U.S. Supreme Court granted certiorari to decide whether silicosis was a compensable injury under the FELA, and whether the statute of limitations barred Urie's claim. The defendant argued that Urie was exposed to silica dust since 1910 and must have unwittingly contracted silicosis more than three years before he filed suit in 1941. The defendant argued in the alternative that each inhalation of silica dust was a separate tort giving rise to a fresh cause of action, and that Urie was therefore limited to a claim for inhalations that occurred within the limitations period. Considering those two constructions, the U.S. Supreme Court decided:

> [N]either of the outlined constructions of the statute of limitations can be sustained. For, if we assume that Congress intended to include occupational diseases in the category of injuries compensable under the Federal Employers' Liability and Boiler Inspection Acts, such mechanical analysis of the "accrual" of petitioner's injury—whether breath by breath, or at one unrecorded moment in the progress of the disease—can only serve to thwart the congressional purpose.

> If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis prior to November 25, 1938, it would be clear that the federal legislation afforded Urie only a delusive remedy.

*Urie*, 337 U.S. at 169, 69 S. Ct. at 1024. Having rejected those constructions, the Court held:

> The record before us is clear that Urie became too ill to work in May of 1940 and that diagnosis of his condition was accomplished in the following weeks. There is no suggestion that Urie should have known he had silicosis at any earlier date. "It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious

16

> substance manifest themselves . . . ." *Associated Indemnity Corp. v. Industrial Accident Commission*, 124 Cal. App. 378, 381, 12 P.2d 1075, 1076 (Dist. Ct. App. 1932). The quoted language, used in a state workmen's compensation case, seems to us applicable in every relevant particular to the construction of the federal statute of limitations with which we are here concerned.

*Urie*, 337 U.S. at 170, 69 S. Ct. at 1025. The Court accordingly held that Urie's claims were not time-barred. Thus, following the U.S. Supreme Court's directive in *Urie*, a claim for an occupational disease under the FELA is not considered to have accrued until the accumulated effects of the injurious exposure manifest themselves.

¶33 Some federal courts have adopted into FELA jurisprudence the articulation the U.S. Supreme Court gave to the discovery rule for the Federal Tort Claims Act in *U.S. v. Kubrick*, 444 U.S. 111, 100 S. Ct. 352 (1979). *See, e.g.*, *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 814 (6th Cir. 1996); *Fries v. Chicago & N.W. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990); *Albert v. Maine Cent. R.R. Co.*, 905 F.2d 541, 544 (1st Cir. 1990); *Townley v. Norfolk & W. Ry. Co.*, 887 F.2d 498, 501 (4th Cir. 1989); *Kichline v. Consol. Rail Corp.*, 800 F.2d 356, 359 (3d Cir. 1986); *Dubose v. Kansas City S. Ry. Co.*, 729 F.2d 1026, 1030 (5th Cir. 1984). In *Kubrick*, the Court held that the statute of limitations begins to run "when the plaintiff knows both the existence and the cause of his injury." *Kubrick*, 444 U.S. at 113, 100 S. Ct. at 355. Failing to recognize the unique aspects of the FELA—notably, the mandate to liberally construe the Act in order to achieve its humanitarian and remedial purpose—these courts have erroneously applied *Kubrick* to FELA cumulative trauma cases and have further held that a worker's repetitive exposure to dangerous working conditions does not

transform a "definite and discoverable" injury into a continuing tort. *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1237 (10th Cir. 2001).[2]

¶34    The gravamen of Anderson's argument on appeal is that the way courts relying on these precedents typically apply the discovery rule in FELA cases makes it effectively impossible for most railroad workers to bring a timely claim for a cumulative trauma injury.  He argues that this is contrary to the clear instructions from the U.S. Supreme Court that the FELA is to be construed liberally to achieve its humanitarian and remedial purpose, and hence, the District Court should have determined the statute of limitations issue as a matter of law by following one of three approaches:

1.  Applying the continuing tort doctrine to Anderson's cumulative trauma injury claim (which he treats as including his negligent work assignment claim);

2.  Allowing the jury to award damages for any aggravation of an existing injury or condition caused by negligent work assignments during the three years before filing suit; or

3.  Defining "injury" narrowly to exclude non-disabling aches and pains.

Anderson argues that unless one of these rules is adopted for FELA cases, workers will continue to be unable to recover for negligently caused cumulative trauma injuries.

¶35    Anderson reminds us that the "FELA is to be given a liberal construction in favor of injured railroad employees so that it may accomplish its humanitarian and remedial purposes." *State ex rel. Burlington N. R.R. v. Dist. Court*, 270 Mont. 146, 891 P.2d 493,

---

[2] This Court relied in part on *Matson* and *Kubrick* in *Bridgman v. Union Pac. R.R.*, 2013 MT 289, 372 Mont. 124, 311 P.3d 416.  For discussion of *Bridgman*, see ¶¶ 43–44 of this Opinion.

498 (1995). As the U.S. Supreme Court stated nearly 60 years ago, "it is clear that the general congressional intent was to provide liberal recovery for injured workers." *Kernan* v. *Am. Dredging Co.*, 355 U.S. 426, 432, 78 S. Ct. 394, 398 (1958). The U.S. Supreme Court's "drumbeat of liberal interpretation," *Miller*, 858 A.2d at 1038, has continued into its modern FELA jurisprudence. *See Atchison, T. & S. F. R. Co. v. Buell*, 480 U.S. 557, 561–62, 107 S. Ct. 1410, 1413–14 (1987) ("We have recognized generally that the FELA is a broad remedial statute, and have adopted a standard of liberal construction in order to accomplish Congress' objects.") (internal quotations omitted); *Gottshall*, 512 U.S. at 543, 114 S. Ct. at 2404 ("We have liberally construed FELA to further Congress' remedial goal."). It is the courts' duty to prevent erosion of the FELA by narrow and miserly construction. *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 509, 77 S. Ct. 443, 450 (1957). In this Court's analysis of FELA claims, "we have followed federal case law in giving a liberal construction in favor of injured railroad workers so that FELA may accomplish its humanitarian and remedial purposes." *Davis v. Union Pac. R.R.*, 282 Mont. 233, 245, 937 P.2d 27, 34 (1997).

¶36 The problem, Anderson points out, is that workers suffering from a cumulative trauma injury are often aware that they have some musculoskeletal pain, and are aware that it is connected to their work for many years before they have any reason, or even ability, to bring suit. Despite the pain, they are frequently able to work without restriction, and have suffered no discernable economic loss. It will frequently be the case, as it was here, that the worker will be able to continue working normally for years after realizing the pain he has been experiencing is work-related. By the time he

experiences the "straw that broke the camel's back" and becomes disabled, more than three years will likely have passed and his claim will be time-barred.

¶37    In light of the clear policy of liberal interpretation in favor of workers, it is anomalous that the discovery rule the U.S. Supreme Court announced in *Urie* has been interpreted by some to *preclude* workers from bringing occupational disease claims when the rule was specifically crafted to save occupational disease claims from the statute of limitations. The simple reality is that manual labor causes aches and pains. It is the rare worker who will perform heavy manual labor for decades without experiencing painful side-effects. Few will bring suit for what is widely considered a normal part of work and from which they have suffered little or no economic loss. The clear logic of *Urie*'s rationale is that a worker is not required to bring suit before it is realistically possible to do so, and that the FELA's statute of limitations should not be interpreted to preclude recovery for an entire category of injuries. The *Urie* Court held that the statute of limitations in FELA cases is tolled until the accumulated effects manifest themselves because the alternative interpretations defied Congress' intention to create a broad remedy for workers injured by a railroad's negligence. Thus, the *Urie* Court recognized that some modification to the calculation of the statute of limitations was necessary to ensure that an entire category of injuries—occupational diseases—was not placed beyond remedy, and not relegated to what the Court held would be "only a delusive remedy."

¶38    BNSF counters that the discovery rule requires a plaintiff to bring suit within three years of learning of the injury and its cause, and the discovery rule controls questions of when the clock began to run for the statute of limitations in FELA cases. BNSF further

contends that the discovery rule does not require that the injury has reached maximum severity, or that the plaintiff know the seriousness of the injury before the statute of limitations begins to run.

¶39 The Second, Fifth, and Seventh circuits have made statements to that effect in FELA cases. *Mix v. Del. & Hudson Ry.*, 345 F.3d 82, 87 (2d Cir. 2003) ("The fact that [the plaintiff] may not have had actual knowledge of his medical diagnosis would not relieve him of his duty of exercising due diligence based upon strong indications that he did, in fact, have an injury."); *Crisman v. Odeco, Inc.*, 932 F.2d 413, 415 (5th Cir. 1991) ("[W]hen an event occurs that should put a plaintiff on notice to check for injury, this is sufficient to start the prescriptive period running. This is true even if the event results in only minor physical effects."); *Fries v. Chi. & Nw. Transp. Co.*, 909 F.2d 1092, 1096 (7th Cir. 1990) (that plaintiff's injury had not reached its maximum severity does not affect the requirement that the plaintiff bring suit within three years of acquiring constructive knowledge of his injury and its cause). The result of these holdings is that cumulative trauma injuries are barred when a plaintiff does not bring suit within three years of discovering facts that objectively put him on notice of his injury and its cause— even though his injury never amounted to more than sporadic pain at any point in those three years, and even though further negligence has caused further injury.

¶40 BNSF's argument ignores the practical effect of applying the discovery rule in such a manner, which is to preclude cumulative trauma injury claims irrespective of the worker's continuing exposure to the source of the trauma. This is precisely the situation that led the *Urie* Court to reject both a construction of the FELA's statute of limitations

that would have required the plaintiff to bring suit within three years of the time he most likely contracted silicosis, and a construction that would give rise to a fresh cause with each inhalation of silica dust—that is, such constructions "can only serve to thwart the congressional purpose" because they would mean that the FELA provided plaintiffs with occupational diseases "only a delusive remedy." *Urie*, 337 U.S. at 169, 69 S. Ct. at 1024. A construction of the statute of limitations that would require a plaintiff with a cumulative trauma injury to bring suit when recovery is practically unrealizable or forever forego any right to recovery—even for further injury from later negligence— would similarly render the FELA "only a delusive remedy" and runs contrary to the mandate to liberally interpret the FELA to achieve its humanitarian and remedial purposes.

¶41    The most glaring problem with BNSF's argued logic and the cases supporting it is that they ignore the reality that the injuries are not merely worsening as a function of biology, but as a function of further negligence.  Were we to follow BNSF's argued approach, it would provide railroads with a grant of immunity from the consequences of their negligence.  If negligence that worsens a prior injury were time-barred because the prior injury was time-barred, it would absolve the railroad of its duty to provide a safe work environment to anyone already injured by its negligence.  That result runs contrary to the clear intention of the FELA, about which the U.S. Supreme Court long ago noted: "[The FELA] is intended to stimulate carriers to greater diligence for the safety of their employees." *Jamison v. Encarnacion*, 281 U.S. 635, 640, 50 S. Ct. 440, 442 (1930).  A railroad could take an employee who had been suffering early, non-disabling signs of an

22

occupational disease for more than three years and assign him to the same work that caused the occupational disease in the first place, and thereby continue to injure the worker with impunity. Rather than making the work safe, the railroad would be incentivized to assign the injured employee to the same work with the same equipment because that employee could not pursue recovery for any further injury. A railroad would be permitted, for example, to assign an employee who had been diagnosed with asbestosis, but did not file a timely claim, to be the designated asbestos remover, since the employee would have no recourse. The railroad could even refuse to provide him with a respirator—despite the fact that doing so would cause the asbestosis to worsen.[3] The statute of limitations should not be interpreted in a manner that allows the defendant to acquire a right to continue the tortious conduct. *McCoy v. Foss Mar. Co.*, 2006 U.S. Dist. LEXIS 22716, *6 (W.D. Wash. 2006) (construing the Jones Act). Such results are no more commensurate with the FELA than the approaches argued by the defendant in *Urie*. Just as the U.S. Supreme Court was compelled to do in *Urie*, so are we compelled to reject such a construction of the FELA here.

¶42    Moreover, such an approach is not necessary to protect the interests statutes of limitation are meant to protect. Statutes of limitations "characteristically embody a policy of repose, designed to protect defendants. And they foster the elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Lozano v. Montoya Alvarez*, ___ U.S. ___, 134 S. Ct. 1224, 1234

---

[3] We, of course, are not suggesting that a railroad has, or would, intentionally harm one of its employees. We offer this example solely to illustrate the flaws in BNSF's argument.

(2014) (internal quotations and citations omitted). Where a plaintiff is alleging that the defendant negligently caused further injury within the limitations period, none of the interests the statute of limitations is meant to protect are implicated.

¶43 BNSF argues that our decision in *Bridgman v. Union Pac. R.R.*, 2013 MT 289, 372 Mont. 124, 311 P.3d 416 controls the disposition of this case. In *Bridgman*, the sole issue on appeal was the discovery rule. *See Bridgman*, ¶¶ 17–18. On the issue of the discovery rule, we have held in this case that the District Court did not err by submitting the question to the jury. *See* ¶ 72. Unlike Bridgman, however, Anderson has also argued that his injuries were caused, at least in part, by the railroad's continued negligence within the three years preceding his suit. This argument was not presented to us in *Bridgman*, nor was it considered. BNSF's reliance on *Bridgman*, therefore, is misplaced.

¶44 Moreover, although we chose to take guidance from the federal circuit courts in the context of the plaintiff's specific arguments in *Bridgman*, ¶ 28, we note for clarification that in 1910 Congress amended the FELA with the specific purpose of granting state courts concurrent jurisdiction with the federal courts. 45 U.S.C. § 56. Congress also specifically directed that FELA cases filed in state court cannot be removed to federal court under any circumstances. 28 U.S.C. § 1445(a). Regarding the application and interpretation of the FELA, the U.S. Supreme Court explicitly recognized that the courts are expected to develop a body of common law around the FELA that adapts to changing concepts and recognitions, keeping in mind the general congressional intent that the FELA provide liberal recovery for injured workers:

> [I]nstead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law. But it is clear that the general congressional intent was to provide liberal recovery for injured workers . . . and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers.

*Kernan*, 355 U.S. at 432, 78 S. Ct. at 398. The FELA thus presents the unusual situation of a federal statutory scheme whose scope and meaning may be determined by state courts acting only within the confines of the FELA's general language, a broad policy of liberal interpretation, and binding U.S. Supreme Court precedent. *Bridgman* therefore should not be read to suggest that we are bound to follow federal circuit court precedents. We reiterate, however, that the discovery rule, as articulated by the U.S. Supreme Court in *Urie*, continues to apply in FELA cases as we have applied it in this case.

¶45    *a. Does the continuing tort doctrine apply to cumulative trauma injuries under the FELA?*

¶46    While we agree with Anderson that the discovery rule is often applied in a manner that defeats the ability of workers to bring cumulative trauma claims, we do not see any need to apply the continuing tort doctrine to claims alleging a cumulative trauma injury or negligent work assignment. The plain language of the FELA and the U.S. Supreme Court's interpretations of such claims provide ample means for a worker to bring a timely claim for a cumulative trauma injury even where he or she experienced work-related pain more than three years before filing suit.

25

¶47  Section 51 of the FELA states: "Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death *resulting in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier."  45 U.S.C. § 51 (emphasis added). Section 56 states: "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued."  45 U.S.C. § 56.  Thus, irrespective of the discovery rule, if a railroad worker can show that he suffered injury, caused "in whole or in part" by the railroad's negligence, within the three years preceding the filing of his claim, the worker may pursue recovery for that injury.

¶48  A worker has brought a timely FELA claim for a cumulative trauma injury if the worker can show (1) he has an injury; and (2) the railroad's negligence caused that injury, in whole or in part, within the three years preceding the filing of the suit.  This is so whether "the straw that broke the camel's back" is treated as part of the same injury, or a separate injury.  Either way, the disabling injury was caused *in whole or in part* by the railroad's negligence within three years of suit being filed.  The U.S. Supreme Court has clearly stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury or death for which damages are sought.  It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes."  *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 448 (1957) (emphasis added).

26

¶49 Though it has always been the case, the FELA's unique standard of causation seems to have gotten lost in the discussions regarding the statute of limitations for cumulative trauma injuries. As articulated in *Rogers*, the FELA expressly allows for recovery where the railroad's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers*, 352 U.S. at 506, 77 S. Ct. at 448. "[This] understanding of *Rogers* . . . has been accepted as settled law for several decades." *McBride*, ___ U.S. at ___, 131 S. Ct. at 2641 (citation and internal quotation marks omitted). The U.S. Supreme Court has further made it clear that this standard of causation is not reserved for any particular type of FELA claim to the exclusion of others. Rather, the Court has confirmed that "*Rogers* announced a general standard for causation in FELA cases, not one addressed exclusively to injuries involving multiple potentially cognizable causes." *McBride*, ___ U.S. at ___, 131 S. Ct. at 2639.

¶50 Moreover, even though some part of the injury may have been caused by negligence occurring prior to the limitations period, and was discovered by the employee more than three years before filing suit, the FELA does not allow for apportionment for any reason other than the employee's contributory negligence. As the U.S. Supreme Court noted in interpreting the FELA's "in whole or in part" causation standard:

> [T]o require apportionment would put [the in whole or in part] provision [of 45 U.S.C. § 51] in tension with the rest of the statute. . . . [S]everal of the FELA's provisions expand a railroad's liability by abolishing common-law defenses that limited employees' ability to recover against their employers. Among the innovations, the Act expressly directs apportionment of responsibility between employer and employee based on comparative fault. See § 53. *The statute expressly prescribes no other apportionment.*

*Ayers*, 538 U.S. at 161, 123 S. Ct. at 1225 (emphasis added, internal parenthetical omitted). This holding is clear—the *only* permissible apportionment under the FELA is for contributory negligence of the plaintiff. Thus, even though a worker's cumulative trauma injury may have been caused only "in part" by the railroad's negligence within the three years preceding the filing of his claim, the FELA expressly allows for full recovery for that injury, subject only to reduction attributed to the employee's contributory negligence.

¶51   Nothing in the FELA suggests that a claim is time-barred because the injury was caused in part by earlier negligence by the railroad for which the worker could have brought suit, but did not. The determinative question is whether the railroad's negligence that is the subject of the worker's claim "played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers*, 352 U.S. at 506, 77 S. Ct. at 448. This is in keeping with the plain language of the statute as well as the U.S. Supreme Court's directive that the FELA is to be construed liberally in favor of workers and against importing restrictions into the FELA where the statutes contain no language to that effect.

¶52   The argument that a previous injury that is time-barred by the discovery rule can preclude recovery for further injury caused by later negligence runs contrary to the plain language of the FELA and consistent U.S. Supreme Court precedent that allows for full recovery for injuries caused even to the slightest degree by the railroad's negligence and disallows apportionment for anything other than comparative fault. We thus reject this argument.

28

¶53   In light of the plain language of 45 U.S.C. § 51, as it has been consistently interpreted by the U.S. Supreme Court, we find it unnecessary to apply the continuing tort doctrine to Anderson's FELA claim.  If the jury determines that a worker discovered his or her work-related injury *less* than three years prior to filing suit, then the jury may consider any of the railroad's acts or omissions that the worker alleges contributed to the injury in determining liability.  If the jury finds the railroad caused the worker's injury, even to the slightest degree, then the worker is entitled to recover damages for the full scope of his or her injury—less any reduction for comparative negligence.  If, however, the jury determines that a worker discovered his or her work-related injury *more* than three years prior to filing suit, then the jury may consider only the railroad's acts or omissions that occurred within the three-year limitations period in determining liability. But if the jury finds the railroad caused the worker's injury, even to the slightest degree, during that three-year period, then the worker is entitled to recover damages for the full scope of his or her injury—less any reduction for comparative negligence.

¶54   To sum up: When addressing the timeliness of cumulative trauma injury claims under the FELA, the initial question is when the injured worker discovered he or she was suffering from a work-related injury.  If the claim is filed within three years of that discovery, the claim is timely and the analysis need go no further.  If the claim is not filed within three years of that discovery, the claim will be considered untimely only if *no part* of the injury was caused within the three years preceding the filing of the claim.  In keeping with the plain language of 45 U.S.C. §§ 51 and 56, if the claim alleges injury

29

caused "in whole or in part" by the railroad's negligence within the three years preceding the filing of the claim, the discovery rule does not bar the claim.

¶55 In this case, Anderson proposed jury instructions that would have effectively informed the jury on the above analysis. Anderson's proposed instruction #47 stated, "Where an injury results from a negligent act and additional injury occurs by reason of continued negligence, a railroad worker may recover for all damages caused by the continuing negligence even if a claim based on the original negligent act may be barred by the statute of limitations." Anderson's proposed instruction #31 stated, "You are instructed that the Federal Employer's Liability Act which governs this case does not allow apportionment of damages between railroad and non-railroad causes. Thus, once Mr. Anderson has shown that the railroad's negligence was responsible for his injuries to the slightest degree, [BNSF] is responsible for 100% of Mr. Anderson's damages." While the analysis we outlined above presents a clearer statement of the applicable law, Anderson's proposed instructions effectively stated the appropriate legal standard. The District Court denied the instruction, however, and gave no comparable alternative that fully and fairly instructed the jury on the applicable law as to this issue.

¶56 The two instructions relevant to this issue that were given by the District Court did not fully and fairly instruct the jury on the applicable law. The first instruction read, "The railroad has a continuing obligation to assign people to work within their physical capabilities." The instruction is problematic because it implies that so long as the employee is physically able to complete the work, then the railroad has not breached a duty. In fact, to accurately reflect what the law says in the context of negligent work

30

assignment and cumulative trauma claims, the instruction should read "The railroad has a continuing obligation to assign an employee to work *that does not present an unreasonable risk of injury to that employee*."

¶57 The second instruction, which explained the statute of limitations, also did not fully and fairly inform the jury on the applicable law. The District Court's instruction stated:

> A statute of limitations bars a plaintiff's claim if he or she does not bring it within a prescribed period of time. In this case that period of time is 3 years. The period in which the suit must be brought begins when Anderson knew or had reason to know that the existence and cause of his injury were work-related. Anderson had a duty to exercise reasonable diligence and to investigate the cause of a known injury. It is enough to know that Anderson's work is a possible cause of an injury to trigger a duty to investigate work conditions and pursue potential claims.

This instruction, however, did not make clear that so long as Anderson had an injury, and the injury was caused at least in part by negligence that occurred within three years of filing suit, then his claim was timely.

¶58 The trial court must instruct the jurors fully and correctly on the applicable law of the case. *W. Sec. Bank v. Eide Bailly LLP*, 2010 MT 291, ¶ 67, 359 Mont. 34, 249 P.3d 35. Although the District Court made an earnest attempt to formulate appropriate instructions for this unusual area of law, we conclude that the jury instructions did not fully and correctly inform the jury of the applicable law. The absence of an instruction making clear that a claim is timely if it alleges that the railroad's negligence caused any injury in the three years preceding the claim, regardless of any time-barred injuries, prevented the jury from determining whether BNSF was liable for

31

Anderson's injuries. We thus conclude the District Court erred in refusing to instruct the jury on this facet of FELA law.

¶59     *b. Can an employee recover under the FELA for aggravation of a time-barred injury?*

¶60     Anderson's alternative argument, that the jury should have been permitted to consider damages for any negligently caused aggravation of a time-barred injury, is consonant with what we have outlined above. Again, the plain language of the FELA states that a worker may recover for any injury caused in whole or *in part* by the railroad's negligence. Thus, it is evident that aggravation of an existing injury is compensable under the plain language of the FELA as discussed above.

¶61     We note that some courts have required that damages be apportioned in such cases so that a worker may only recover for as much of the injury as occurred within the limitations period. *See, e.g.*, *Kichline*, 800 F.2d at 361. Such apportionment, however, is in direct contravention of the U.S. Supreme Court's specific directive in *Ayers* that the FELA "expressly directs apportionment of responsibility between employer and employee based on comparative fault. See § 53. The statute expressly prescribes *no other apportionment.*" *Ayers*, 538 U.S. at 161, 123 S. Ct. at 1225 (emphasis added). *Urie*, *Rogers*, *Ayers*, and *McBride* have consistently made clear that 45 U.S.C. § 51 means exactly what it says—even if a railroad employee's injury was caused only *in part* by the railroad's negligence, the worker may nonetheless recover for the entire injury. Thus, apportioning damages because the railroad also negligently caused an underlying injury prior to the limitations period runs afoul of the statute and is not permissible.

32

¶62     BNSF argues that the issue of aggravation is immaterial because Anderson did not plead a separate cause of action for aggravation and did not ask to submit a jury question on aggravation.  While it is true that Anderson did not plead aggravation as a discrete cause of action, he alleged in his amended complaint that "[t]hese continuing work assignments, and other job duties required of a carman, caused or aggravated the physical injuries described above and damages alleged above."  Anderson proposed a related instruction stating, in pertinent part:

> A railroad worker can also recover for any aggravations to existing injuries, provided that the aggravation was caused to the slightest degree by a distinct act or acts of negligence . . . .

As discussed in the definitions at the beginning of this opinion, "aggravation" does not refer to a type of claim, or a theory of negligence, but rather to the nature of the alleged injury.  It is thus appropriate to a jury instruction.  As with the proposed instructions discussed earlier, the analysis we outlined above presents a clearer statement of the applicable law.  Anderson's proposed instruction nonetheless accurately reflects the plain language of the FELA statutes and the U.S. Supreme Court's holding in *Rogers*, as discussed in the preceding section.  The District Court rejected the instruction, however, which prevented Anderson from recovering for aggravation.

¶63     Given that the language of the FELA statutes allows compensation for aggravation and Anderson's proposed instruction accords with the statutes and U.S. Supreme Court precedent, we hold that it was error for the District Court to refuse to give a jury instruction on aggravation.

33

¶64        *c. Do non-disabling aches and pains constitute an "injury" under the FELA?*

¶65    Anderson argues that we should adopt a narrow definition of "injury" for purposes of cumulative trauma claims that excludes non-disabling aches and pains. Anderson asks us to define injury in such a way that non-disabling aches and pains do not trigger the discovery rule. Anderson points out that this is the approach we have taken in workers' compensation cases. In *Dvorak v. Montana State Fund*, we noted that a worker does not have constructive knowledge that she is suffering from an occupational disease simply because she is suffering mere pain from her work, "otherwise, every ache and pain a worker suffers after a hard day at work would constitute an occupational disease." *Dvorak v. Mont. State Fund*, 2013 MT 210, ¶ 21, 371 Mont. 175, 305 P.3d 873. Anderson argues that we should adopt the same reasoning here and hold as a matter of law that Anderson's knowledge that he had various musculoskeletal pains in December 2005 did not trigger the discovery rule.

¶66    BNSF counters that the FELA is not a workers' compensation scheme, and thus that the reasoning in *Dvorak* cannot be applied in this case. BNSF points out federal decisions recognizing that the FELA is not a workers' compensation statute, *Gottshall*, 512 U.S. at 543, 114 S. Ct. at 2404 and *Oglesby v. S. Pac. Transp. Co.*, 6 F.3d 603, 606 (9th Cir. 1993).

¶67    The U.S. Supreme Court has noted, "We have insisted that FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Gottshall*,

34

512 U.S. at 543, 114 S. Ct. at 2404 (quotations and citations omitted). As that statement suggests, the difference between the FELA and workers' compensation schemes lies in their different treatment of liability. Workers' compensation is a no-fault scheme while the FELA requires that the injury be caused, at least to some degree, by the employer's negligence before an employee may recover for the injury. Because the two treat liability differently, any rules regarding liability have no cross-application.

¶68 Reasoning regarding application of the statute of limitations to occupational diseases, however, applies with equal force to both. The U.S. Supreme Court recognized this in *Urie* when it quoted language from a California workers' compensation case and noted that "[t]he quoted language, used in a state workmen's compensation case, seems to us applicable in every relevant particular to the construction of the federal statute of limitations with which we are here concerned." *Urie*, 337 U.S. at 170, 69 S. Ct. at 1025 (quoting *Assoc. Indem. Corp.*, 12 P.2d at 1076). Thus, while *Dvorak* is not binding on our analysis, it is certainly instructive in determining when a worker has suffered injury.

¶69 In keeping with binding U.S. Supreme Court precedent, we reiterate what the U.S. Supreme Court said in *Urie*: a worker is considered injured in FELA cases "when the accumulated effects of the [injurious exposure] manifest themselves." *Urie*, 337 U.S. at 170, 69 S. Ct. at 1025. This is the appropriate—indeed mandatory—way to treat the definition of "injury" for purposes of applying the discovery rule in an FELA claim alleging a cumulative trauma injury or other occupational disease. Hence, we need not apply *Dvorak* here to reach the appropriate definition of "injury."

¶70 Anderson argues, in effect, that the-straw-that-broke-the-camel's-back scenarios common to cumulative trauma injuries mark the point at which the accumulated effects manifest themselves. While there is logic in this argument, what constitutes the manifestation of the accumulated effects of the injurious exposure—as opposed to the merely transient aches and pains common to advancing age and manual labor—is a question of fact, appropriately reserved to the jury.

¶71 Anderson further points out that the primary injury he claimed at trial was his lower back injury, while the degenerative disc disease he reported in his March 2006 injury report was to a thoracic disc in his mid-upper back. Again, however, that is a question of fact for the jury.

¶72 In general, it will be the rare case in which application of the discovery rule in a cumulative trauma case is properly decided as a matter of law. The issue will usually involve factual disputes that must be decided by the jury. Accordingly, we conclude that the District Court correctly determined that the question of when Anderson discovered his injury was a question of fact for the jury.

¶73 *2. Did counsel for BNSF make improper comments that deprived Anderson of a fair trial?*

¶74 Anderson argues that BNSF's counsel made improper statements that deprived him of a fair trial. Before trial, Anderson filed motions in limine to prevent BNSF from making improper personalization, opinion, or commentary on Mr. Anderson and his attorneys and to prevent making arguments likely to inflame the jury by stating that lawsuits should not improve a plaintiff's standard of living or make him a millionaire.

36

The District Court granted the motions before trial. Anderson points to the following statements by BNSF's counsel as violations of those motions in limine:

> When you go back ask yourself, in our society, are lawsuits about making people wealthy, at the expense of a corporation? We've got a lot of money, but is that a reasonable thing to do? No, I don't think so.
>
> .    .    .
>
> And then he told us that he went to a union meeting where there was—which is fine, union meetings—but an FELA lawyer, like these gentlemen [indicating Anderson's attorneys] showed up and gave them [a] presentation. And the presentation was: Hey, if you've got aches and pains, sue your company, because we can prove—we can put on the Dr. Harrisons and the Dr. Marleys of the world, and we can make a claim for you, even though Dr. Nolan tells us that those aches and pains, they're not really work-related.
>
> .    .    .
>
> And then as these claims go on, then they suddenly become called cumulative trauma claims. The employee reports that they have [a] cumulative trauma claim. Maybe—maybe that's a result of some of these presentations.

Anderson also points to questions asked by BNSF while cross-examining Anderson that similarly implied the presentation given by the union attorney was part of a conspiracy to bring bogus claims:

> Q. He was a plaintiff's attorney designated by your union, just as—he's a plaintiff's attorney, just like these gentlemen. He represented workers, right?
>
> A. That's right.
>
> Q. Right. And so what he was there doing was essentially seeking to sign up claims?

¶75 We consider alleged improper statements during closing argument in the context of the entire argument. *Seltzer v. Morton*, 2007 MT 62, ¶ 92, 336 Mont. 225,

37

154 P.3d 561.   Our review of the entire argument reveals further improper statements made by BNSF:

> But then $3,000,000?   What kind of symptoms—it amazes me there's a system where you can come in and ask for $3,000,000, because of an incident at work that you and I know is almost 100 percent Mr. Anderson's fault.
>
> .   .   .
>
> So a careless person can come in, in a system, and ask for $3,000,000, for something that he caused?

BNSF also made repeated references to collateral sources, such as retirement benefits railroad employees receive, and accused Mr. Anderson of trying to "double dip" by pursuing damages for lost fringe benefits.   BNSF also pointed out that some of Anderson's witnesses had sued BNSF, despite receiving full retirement benefits to which they were entitled because of their years of service and independent of their FELA claims.

¶76   BNSF offered no evidence of any conspiracy to bring bogus claims made by the attorney who gave the presentation at Anderson's union meeting, Anderson's own attorneys, his doctors, or the co-workers Anderson called to testify at trial.   BNSF's arguments in that regard—which amounted to nothing other than baseless innuendo— nonetheless encouraged the jurors to speculate that such collusion existed.   Despite the motions in limine and two contemporaneous objections, the District Court offered no curative instructions to mitigate the prejudice of BNSF's improper arguments.

¶77   BNSF argues that Anderson did not make contemporaneous objections to some of these comments, and thus may not raise them on appeal.   While it is true that failure to make a timely objection to alleged improper statements of counsel in closing argument

constitutes a waiver, *Barnes by & Through Barnes v. United Indus.*, 275 Mont. 25, 30, 909 P.2d 700, 703 (1996), we have repeatedly held that a party need not make a contemporaneous objection if the objection would be redundant of a motion in limine. A motion in limine has "special advantages" and serves an important strategic purpose. *State v. Ingraham*, 1998 MT 156, ¶ 36, 290 Mont. 18, 966 P.2d 103. We have encouraged the use of motions in limine to preserve objections in cases where "[a] party may not wish to register an objection in the presence of the jury for tactical reasons, yet may wish to preserve the objection on appeal." *State v. Crider*, 2014 MT 139, ¶ 19, 375 Mont. 187, 328 P.3d 612 (quoting *Ingraham*, ¶ 36). A party raising an objection through a motion in limine "need not continually renew the objection to preserve alleged errors for appeal." *Hulse v. Dept. of Justice*, 1998 MT 108, ¶ 46, 289 Mont. 1, 961 P.2d 75. Since Anderson moved to exclude such comments, he was not required to make contemporaneous objections to preserve the issue for appeal.

¶78 BNSF's urges us to examine each improper statement in isolation and dismiss them as not prejudicial. Were the issue isolated to only one of any of the comments made, we might agree that the danger of prejudice was too remote to require any remedy. We do not view such statements in isolation, however, but in the context of the entire argument, or the entire trial where improper lines of questioning are also employed. Repeated improper statements create cumulative prejudice, and we accordingly view them collectively rather than individually.

¶79 Boiled down, BNSF employed a consistent tactic to characterize Anderson's case as little more than an attempt to get rich off of non-existent injuries with the aid of

unscrupulous attorneys, dishonest coworkers, and mercenary doctors. They were inflammatory and wholly inappropriate. They undermined the truth-finding function of the jury trial by encouraging jurors to base their decision on prejudice, rather than evidence. In so doing, BNSF's attorneys consistently violated the District Court's orders in limine.

¶80 Cases should be decided on their merits, not on the basis of the amount of improper prejudice that can be injected into a trial. We have long held that the acid of improper argument may eat away at the evidence, leaving only prejudice against the party towards whom the argument is directed. *Kuhnke v. Fisher*, 210 Mont. 114, 125, 683 P.2d 916, 922 (1984). In such cases, we are compelled to overturn the jury's verdict and remand for a new trial. Having reviewed the trial and the arguments in their entirety, BNSF's repeated violations of the District Court's orders in limine were simply too prejudicial for us to retain confidence that the jury's verdict was based on the evidence and not prejudice. BNSF's defense on the merits of Anderson's claims was based in large part on the argument that cumulative trauma injuries do not exist. While this may be a valid defense and BNSF is certainly permitted to present competent evidence to that effect, the validity of this defense is compromised when it is packaged with improper arguments appealing to prejudice.

¶81 In light of the foregoing, we conclude that the District Court abused its discretion in failing to grant Anderson's motion for a new trial. Because cumulative prejudice from BNSF's unlawful appeal to the passions and prejudices of the jury denied Anderson a fair

40

trial, the only way the unfairness can be corrected is "by starting anew the legal contest." *Cooper*, ¶ 43.

## CONCLUSION

¶82 We hold that BNSF's prejudicial arguments and questions deprived Anderson of a fair trial, and thus we remand for a new trial. On retrial, the jury should be given appropriate instructions concerning the timeliness of Anderson's claim, consistent with this opinion. As summarized above at ¶ 54, when addressing the timeliness of cumulative trauma injury claims under the FELA, the initial question is when the injured worker discovered he or she was suffering from a work-related injury. If the claim is filed within three years of that discovery, the claim is timely and the analysis need go no further. If the claim is not filed within three years of that discovery, the claim will be considered untimely only if no part of the injury was caused within the three years preceding the filing of the claim. In keeping with the plain language of 45 U.S.C. §§ 51 and 56, if the claim alleges injury caused "in whole or in part" by the railroad's negligence within the three years preceding the filing of the claim, the discovery rule does not bar the claim.

¶83 We reverse and remand for a new trial consistent with this opinion.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ MIKE E WHEAT
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ JIM RICE

41

Justice Michael E Wheat, concurring.

¶84    I agree with the Court's analysis and conclusions on the first issue. I also agree with the Court's decision to reverse and remand to the District Court on the basis that BNSF's prejudicial arguments and questions deprived Anderson of a fair trial. I would, however, remand to the District Court with an instruction to enter default judgment on liability against BNSF. A new trial is insufficient to dissuade this particular litigant from its repeated attempts to prevail through misconduct rather than on the merits of its case.

¶85    We recently noted in *Spotted Horse v. BNSF* that the defendant here appears to have a pattern of practice that relies on misconduct to prevail in court. *See Spotted Horse v. BNSF*, 2015 MT 148, ¶¶ 22–27, 379 Mont. 314, 350 P.3d 52 (listing district court cases documenting discovery abuses and spoliation of evidence by BNSF). I note that Hedger Friend, PLLC, the law firm representing the BNSF here is the same firm (albeit a later iteration of the firm) that represented BNSF in the district court cases we cited to show a pattern and practice of misconduct. I also note that in one of those cases, the district court commented that it "repeatedly warned BNSF, through its common counsel, about its common pattern and practice of discovery in other FELA cases currently or recently pending." Order Imposing Sanctions, *Danielson v. BNSF*, CDV-04-124(d) at 15 (Mont. Eighth Jud. Dist. Ct March 13, 2006). Despite those warnings, BNSF's counsel continued to engage in conduct the district court characterized as "part of a larger recurring pattern and practice of dilatory and obstructive discovery practices." *Danielson* at 25. The district court sanctioned BNSF for its misconduct by barring BNSF from

presenting any evidence or argument contesting the plaintiff's proof of negligence in one case and granting default judgment as to liability in the other. *Danielson* at 25.

¶86    I also note that every time BNSF is called to account for its misconduct, it takes the same approach it took here, which is to treat each incidence of misconduct as though it occurred in isolation from all the others. A district court in Minnesota noted that tactic in an order granting over $4 million in sanctions against BNSF for multiple, flagrant instances of misconduct:

> This Court is satisfied that the record, which has developed over a period of six years, overwhelmingly supports a finding that BNSF did, in fact, engage in conduct and decision making that compromised critical evidence, interfered with witnesses, impeded the investigation by law enforcement, and misled and/or misrepresented a number of facts to Plaintiffs and this Court. BNSF has attempted to explain away this misconduct in piecemeal fashion by attributing much to inadvertence, coincidence, honest mistake, and/or legitimate business practices. This Court is simply not persuaded. Taken alone, some of BNSF's abuses might not be sanctionable, and indeed might have been understandable given the complexities of this case. But the breadth of BNSF's misconduct in this case is staggering.

Order, *Chase v. BNSF*, No. C4-05-1607 (Minn. Tenth Jud. Dist. Ct, Oct. 15, 2009). The majority opinion here notes the same problem with BNSF's tactic of treating each incidence of improper argument in isolation. Opinion, ¶ 78. I submit that just as we refuse to view each improper comment in isolation from the others, so should we refuse to view this case in isolation from all the other documented cases in which this party has sought to prevail through misconduct. Although the misconduct documented in *Spotted Horse*, *Danielson*, and *Chase* primarily involved discovery abuses, misrepresentations, and evidence tampering, it is nonetheless relevant to the misconduct here because it shows a pattern of trying to win trials by misconduct, rather than merit.

¶87 As I noted in *Spotted Horse*, it is the obligation of every Montana court to protect the integrity of the judicial system and to ensure proper administration of justice. *Spotted Horse*, ¶ 47 (Wheat, J., concurring) (citing *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 31, 297 Mont. 336, 993 P.2d 11). Where a party shows a repeated intent to flout the judicial system's strong preference that cases be decided on their merits—and instead tries to win the case on the basis of how much misconduct it can get away with—that party forfeits the right to have its case decided on the merits, and default judgment on liability becomes the appropriate remedy. In this case, counsel for BNSF sought to prejudice the jury against the judicial system itself by characterizing it as a venue for dishonest plaintiffs and their accomplices to bilk businesses out of millions of dollars by making bogus claims:

> But then $3,000,000? What kind of symptoms—it amazes me there's a system where you can come in and ask for $3,000,000, because of an incident at work that you and I know is almost 100 percent Mr. Anderson's fault.
>
> .   .   .
>
> So a careless person can come in, in a system, and ask for $3,000,000, for something that he caused?

¶88 We have an obligation to protect the judicial system by punishing its misuse and deterring future misuse. *See Richardson v. State*, 2006 MT 43, ¶ 68, 331 Mont. 231, 130 P.3d 634; *Schuff v. A.T. Klemens & Sons*, 2000 MT 357, ¶ 81, 303 Mont. 274, 16 P.3d 1002; *Oliver*, ¶ 34. As the district court demonstrated in *Danielson*—nearly 10 years ago—this party and its counsel will continue to engage in misconduct until the sanctions become painful enough to deter them. Unless and until we become willing to grant the ultimate sanction of default judgment, we can expect to see more of the same.

44

For that reason, I would instruct the District Court on remand to enter default judgment on liability against BNSF. No other remedy is sufficient to deter future abuses.

/S/ MICHAEL E WHEAT

Justice Laurie McKinnon, dissenting.

¶89 I agree with our conclusion that "[b]oth below and on appeal, Anderson did not consistently distinguish between his negligent work assignment claim and his cumulative trauma injury claim, and the confusion carried over into the District Court's order . . . ." Opinion, ¶ 24. However, I think Anderson is responsible for properly pleading and presenting his case in a manner that the District Court can understand and appropriately address legal theories and claims raised. The Court has reached today to reconstruct Anderson's arguments and sort out legal theories pertaining to negligent assignment and the continuing tort doctrine.

¶90 As we have explained on numerous occasions, it is fundamentally unfair to fault the trial court for failing to rule on an argument it was never given an opportunity to consider. *City of Missoula v. Moore*, 2011 MT 61, ¶ 13, 360 Mont. 222, 251 P.3d 679. We will not consider new arguments or legal theories for the first time on appeal. *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 20, 373 Mont. 1, 313 P.3d 839. In my opinion the District Court's resolution of Anderson's motion for new trial and BNSF's motion for partial summary judgment were correct given the arguments and pleadings that had been advanced by Anderson. The Special Verdict Form submitted to

45

the jury is revealing. There are two claims: "Cumulative Trauma Claim" and "December 23, 2008 Single Incident Claim." There is no claim for negligent work assignment. As the District Court observed: "From the start of these proceedings, Anderson has alleged two claims: cumulative trauma and a single act of negligence occurring on December 23, 2008." In Anderson's Amended Complaint, Anderson alleged within both claims that he was negligently assigned work, which aggravated his injuries. As the District Court noted, at no point during the trial was Anderson told he could not produce evidence regarding negligent work assignment in either of his claims. Finally, I cannot construe Anderson's proposed jury instructions as a correct statement of the law and I would not fault the District Court for failing to instruct the jury using Anderson's instructions.

¶91 Regarding the alleged improper argument and examination by BNSF, in addition to adopting the rationale of the District Court, I would add that the trial judge is in the best position to determine whether an attorney's arguments or conduct is prejudicial to the other party. *Durden v. Hydro Flame Corp.*, 1998 MT 47, ¶ 42, 288 Mont. 1, 955 P.2d 160. The District Court considered Anderson's allegations in the context of the trial as a whole and was in a better position than this Court to judge what prejudice, if any, occurred.

¶92 I would affirm the District Court for the reasons stated in its order denying Anderson's motion for new trial.

/S/ LAURIE McKINNON

46