# FILED

July 30 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0655

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 210

DIANNE DVORAK,

       Petitioner and Appellant,

  v.

MONTANA STATE FUND,

       Respondent and Appellee.

APPEAL FROM:    Montana Workers' Compensation Court, WCC No. 2011-2793
               Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              William P. Joyce, Joyce, Johnston & MacDonald, Butte, Montana

       For Appellee:

              William D. Blackaby, Special Assistant Attorney General, Montana
              State Fund, Helena, Montana

                         Submitted on Briefs:  May 1, 2013

                                  Decided:  July 30, 2013

Filed:

                              _____
                                  Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     At some point, Dianne Dvorak contracted an occupational disease arising from her employment with Wheat Montana. She first sought medical treatment in 2006 and periodically thereafter until 2011 when her doctor recommended that she leave her employment because it was worsening her condition. In May 2011, Dvorak initiated a workers' compensation claim. Montana State Fund (State Fund) denied her claim as untimely filed. The Workers' Compensation Court granted summary judgment in favor of State Fund. Dvorak appeals. We reverse and remand.

## ISSUE

¶2     A restatement of the issue is:

¶3     Did the Workers' Compensation Court err in granting summary judgment to State Fund after concluding that Dvorak's claim for occupational disease benefits was barred by the statute of limitations?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     Dianne Dvorak began working at Wheat Montana in Three Forks, Montana, in 2002. She was 52 years old at the time. Initially, she worked in the deli but within six months was transferred to the kitchen, working primarily as a sandwich maker. She frequently worked 10-hour shifts and was on her feet most of the time. On February 28, 2006, Dvorak went to Dr. Terry Reiff, an osteopathic doctor who had been her primary care physician since 1995. At this visit, she complained of headaches and pain in her right shoulder, neck, upper back and ribs. She told Reiff that she had to look upwards and lift her arms above her head multiple times per day at work in order to reach for the

2

bread to make sandwiches. She said the movement had begun to cause her "quite a bit of back pain." Reiff subsequently prescribed Tylenol 3 for the pain which Dvorak refilled regularly through 2011. He also performed cervical and thoracic manipulation which reduced the restrictions and diminished the pain. Dvorak saw Reiff again in November 2007. This visit was for a routine checkup and not for work-related pain. She stated that she occasionally used the Tylenol 3 for pain but did not report pain at that time.

¶5 On December 10, 2007, Dvorak saw Reiff for back pain after she fell on her back while putting up Christmas lights. Reiff performed manipulation of her upper and lower spine and relieved some of the pain. He prescribed anti-inflammatory medications as well. The following week, Dvorak reported to Reiff that she experienced severe right hip and sciatic pain after a 10-hour work shift. Reiff again performed a manipulation on the affected area and injected medications to alleviate the pain. Dvorak continued taking and refilling the various medications Reiff had prescribed, including Tylenol 3.

¶6 Dvorak saw Reiff again on January 20, 2009. She did not complain of back or shoulder pain at this appointment but did report, when discussing her medications, that in addition to the other unrelated medications she took regularly, she took one Tylenol 3 per day. At an August 4, 2009 appointment, Dvorak told Reiff that the repetitive motion at work was again causing pain in her back and shoulders. She said that taking one Tylenol 3 every day helped her get through her long work shifts. At her physical exam with Reiff on October 19, 2010, Dvorak reported again that she continued to take a daily Tylenol 3 but otherwise did not report any acute problems with her neck and back.

¶7     On December 13, 2010, Dvorak saw Reiff and reported that she was in "severe pain in the upper thoracic area" on her right side. Reiff performed manipulation and was able to identify acute pain trigger points in Dvorak's thoracic spine for the first time. He treated those points with injections which relieved much of the pain. This was the first occasion upon which Reiff concluded that Dvorak had a site-specific pathological condition that was not going to resolve with treatment and that her work was placing stress on her upper spine to the extent that it was incapacitating her.

¶8     Dvorak returned to Reiff in March 2011 with intense pain in her right shoulder blade. Again, Reiff manipulated the area and injected the trigger point, providing almost immediate relief. In April 2011, Dvorak saw Reiff twice with continued pain in her back and shoulder. Again, she received manipulation and injections. Also, in light of Dvorak's recent intense localized symptoms, Reiff took spinal x-rays for the first time. On May 3, 2011, with Reiff's assistance, Dvorak completed a Blue Cross/Blue Shield of Montana form indicating that she had seen Reiff on April 12, 2011, for "a work aggravated injury of T6-T7 facet & rib articulation. First began 2/28/06."

¶9     On May 6, 2011, she reported to Reiff that she was in "severe pain in her back." She stated she was unable to work more than two hours without pain medication. Reiff referred her to Dr. Pyette, an orthopedic specialist, and told her she could not work until after she saw Pyette and Pyette had evaluated Dvorak's condition. On this same day, Dvorak filed a First Report of Injury with Wheat Montana reporting the pain she was experiencing in her spine, shoulder and ribs. Notably, Dvorak did not state a claim for benefits for any conditions suffered or treatment incurred prior to December 2010.

4

¶10    On May 17, 2011, Dvorak saw Pyette who recommended a cervical spine MRI. His impressions were (1) thoracic strain/over use [sic] secondary to industrial injury, and (2) possible exacerbation of cervical spondylolytic myelopathy secondary to industrial injury. On June 20, 2011, State Fund denied Dvorak's claim asserting that she had not filed it within the time allotted under § 39-71-601(3), MCA. Because State Fund denied her claim, Dvorak did not undergo the recommended cervical MRI.

¶11    Dvorak did not return to work at Wheat Montana after May 6.

¶12    On August 15, 2011, Dvorak's counsel filed a Petition for Hearing with the Workers' Compensation Court (WCC). In December 2011, State Fund moved for summary judgment, noting that Dvorak had been treated for her work-related pain by Reiff beginning in February 2006, and had continued such treatment through 2011. State Fund asserted that the 12-month statute of limitations set forth in § 39-71-601(3), MCA, applied and that given these five years of treatment, Dvorak knew or should have known that she had a work-related occupational disease long before she filed her claim in May 2011.

¶13    Dvorak countered that her condition prior to October 2010[1] was generalized and would arise and resolve. Additionally, Reiff submitted an affidavit in which he stated that Dvorak's pre-October 2010 work-related injury had reached maximum medical improvement long before the permanent aggravation she experienced in October 2010. Dvorak argued that her work activities in late 2010 and early 2011 were the leading cause

---

[1] Dvorak and Reiff both state that Dvorak's condition changed in October 2010 but the medical records clearly indicate that Dvorak returned to Reiff with new and severe symptoms on December 13, 2010.

of the permanent aggravation, resulting in a "new" occupational disease for which she timely filed for benefits in May 2011.

¶14 The WCC held a summary judgment hearing on the matter on April 16, 2012, during which it heard oral arguments from counsel but did not take testimony. On July 18, 2012, the WCC judge notified counsel that he would grant State Fund's motion for summary judgment. The court issued its final order on October 23, 2012, applying the 12-month statute of limitations and concluding Dvorak had failed to timely file her claim. Dvorak appeals this ruling.

## STANDARD OF REVIEW

¶15 We review the grant of summary judgment de novo, using the same M. R. Civ. P. 56 criteria used by the trial court. Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. Once the moving party has met its burden, the non-moving party must present substantial evidence essential to one or more elements of the case to raise a genuine issue of material fact. We further review a question of law to determine if the district court's legal conclusions are correct. *Harris v. State*, 2013 MT 16, ¶ 11, 368 Mont. 276, 294 P.3d 382. (Internal citations omitted.)

## DISCUSSION

¶16 *Did the Workers' Compensation Court err in granting summary judgment to State Fund after concluding that Dvorak's claim for occupational disease benefits was barred by the statute of limitations?*

¶17 The Montana Legislature adopted the State's first Workers' Compensation Act (WCA) in 1915. Since that time, the WCA has undergone numerous revisions and

6

additions. The Montana Legislature enacted the Occupational Disease Act (ODA) in 1959. These acts remained separate until 2005 when the Legislature repealed the ODA and amended several sections of the WCA to incorporate occupational disease coverage. *Mont. State Fund v. Grande*, 2012 MT 67, ¶ 24, 364 Mont. 333, 274 P.3d 728.

¶18 As claims for occupational disease benefits arose, it became necessary for the courts to determine which ODA statute controlled the claim: (1) the statute in effect on the last day of the claimant's employment; (2) the statute in effect at the time the claimant discovered the occupational disease, or (3) the statute in effect at the time the claim was filed. This Court concluded that the statute in effect on the claimant's last day of employment controls. *Gidley v. W.R. Grace & Co.*, 221 Mont. 36, 37-38, 717 P.2d 21, 22 (1986). Dvorak's last day of work was May 6, 2011; consequently, the 2009 WCA controls. Statutory references in this Opinion will be to the 2009 MCA.

¶19 A primary objective of the Montana workers' compensation system "is to provide, without regard to fault, wage-loss and medical benefits to a worker suffering from a work-related injury or disease." Section 39-71-105(1), MCA. Occupational diseases are considered to arise out of employment or be contracted in the course and scope of employment if the disease is established by objective medical findings and the events occurring on more than a single day or work shift are the major contributing cause of the occupational disease in relation to other factors contributing to the occupational disease. Section 39-71-407(9)(a)-(b), MCA. Recognizing the difference between a work-related injury and a work-related occupational disease, the Legislature specified:

7

[F]or occupational disease claims, because of the nature of exposure, workers should not be required to provide notice to employers of the disease as required of injuries and that the requirements for filing of claims reflect consideration of when the worker knew or should have known that the worker's condition resulted from an occupational disease.

Section 39-71-105(6)(b), MCA.

¶20    Given the language of § 39-71-105(6)(b), MCA, the statute of limitations for an occupational disease set forth in § 39-71-601(3), MCA, provides, in relevant part: "When a claimant seeks benefits for an occupational disease, the claimant's claims . . . must be . . . presented . . . within 1 year from the date that the claimant knew or should have known that the claimant's condition resulted from an occupational disease." The question before the WCC, therefore, was when Dvorak knew or should have known that she was suffering from an occupational disease.

¶21    The 2009 MCA defines "occupational disease" in part as "harm, damage, or death arising out of or contracted in the course and scope of employment caused by events occurring on more than a single day or work shift." Section 39-71-116(20)(a), MCA. The WCC surmised in *Corcoran v. Montana Schools Group Ins. Auth.*, 2000 MTWCC 30, ¶ 52, that the "harm" and "damage" references in the definition of occupational disease

must mean something more than suffering mere pain, otherwise, every ache and pain a worker suffers after a hard day at work would constitute an occupational disease. That . . . construction . . . would be absurd and contrary to common sense. Rather, the terms indicate something more significant, such as a condition requiring medical diagnosis and treatment.

The WCC further stated that the statute of limitations for an occupational disease commences when the claimant "has some specific knowledge of a specific pathological

8

condition stemming from employment and requiring diagnosis and treatment." *Corcoran*, ¶ 53.

¶22 On appeal, State Fund maintains that Dvorak sought medical diagnosis and treatment for work-related pain in February 2006, and that she embarked on a continuous regimen of pharmaceutical treatment thereafter. It notes that she refilled her pain prescription every month for five years and saw her doctor periodically for osteopathic treatments. Based upon these facts, State Fund argues that the one-year statute of limitations was triggered at the time Dvorak first saw her doctor and complained of repetitive motion work-related pain, i.e., February 2006. It asserts that Dvorak knew, or should have known, of the occupational disease at that time.

¶23 Dvorak counters that the WCC mischaracterized her position and ignored the medical evidence and her doctor's affidavit in which he stated that the "major contributing cause" of Dvorak's debilitating condition was Dvorak's work between December 2010 and May 2011. She maintains that during these months she suffered an aggravation of her pre-existing resolved condition which constituted a new compensable occupational disease. She also asserts that by filing her claim in May 2011—within seven months of the exacerbation—she timely filed for compensable benefits.

¶24 The medical records in this case reveal that Reiff diagnosed Dvorak in February 2006 with a work-related "injury" with which there was no associated impairment and that promptly resolved with osteopathic manipulations and medication. The record also shows that between February 28, 2006, and October 19, 2010—a period of four years and eight months—Dvorak saw Reiff eight times for various conditions. Six of these

9

appointments addressed private medical issues wholly unrelated to this case. Only two of the visits referenced work-related upper back and shoulder pain, those being the appointments of February 28, 2006, and August 4, 2009.

¶25 The record establishes that both Dvorak and Reiff believed that Dvorak's original complaint was the result of a work-related strain or injury which resolved itself satisfactorily over time with minor treatment. Neither considered the prospect of an occupational disease until Reiff first undertook diagnostic testing in April 2011. Until that time, when x-rays were taken and she was referred to an orthopedic specialist, Dvorak clearly had no intention of seeking more complex treatment, altering her employment duties or hours, or making a claim for workers' compensation benefits.

¶26 In contrast, between December 13, 2010, and May 6, 2011—a period of less than five months—Dvorak saw Reiff five times with severe thoracic and right shoulder pain. According to Reiff's deposition testimony, it was not until December 2010 that he identified a specific pathological condition related to her upper thoracic and right shoulder area. Additionally, Reiff testified that it was in March or April 2011 that he told Dvorak for the first time that she had an "occupational disease" and she should consider filing a workers compensation benefit claim. However, despite the availability of this undisputed evidence, the WCC did not reference Reiff's deposition or his affidavit in its order granting summary judgment to State Fund. We conclude this was error in that Reiff's testimony raised genuine issues of material fact as to when Dvorak knew or should have known she was suffering from an occupational disease. *See Siebken v. Voderberg,* 2012 MT 291, ¶¶ 20-24, 367 Mont. 344, 291 P.3d 572 (Conflicting evidence

10

was presented as to when Siebken discovered the origin of his work-related injury; therefore, whether his tort claim was barred by the three-year statute of limitations should not have been decided on summary judgment.).

¶27 State Fund places heavy emphasis on Dvorak's continued use of medication. However, the use of the medication cuts both ways. Dvorak could well have assumed that because the medication alleviated her symptoms and allowed her to continue working 10-hour shifts for the ensuing four years, she did not have a disease. Surely, many persons who have not been diagnosed with an occupational disease—and in particular middle-aged persons with a long work history—take pain medications on a daily basis to help them make it through the work day. We have never held that ingestion of pain medication by a full-time employee constitutes proof of the existence of an occupational disease.

¶28 We are concerned that the practical implication of the WCC ruling could be that any worker in Montana who suffers pain at the end of a workday for which she seeks a prescription will be required to file a benefits claim, even if she has every intention of continuing to work and no intention of seeking occupational disease benefits, simply in order to preserve a possible claim that may or may not ripen in the future. We note that the WCC expressed this same concern during the hearing.

¶29 As noted in ¶ 20, the question before the WCC was when Dvorak knew or should have known that she was suffering from an occupational disease. While the Dissent posits that this issue was not raised by Dvorak or questioned by the parties, this was in fact the central issue raised in the State Fund's motion for summary judgment in the

11

WCC, it was the sole basis for the WCC's ruling that is now before us on appeal, and, as State Fund argues on appeal, "the interpretation of the phrase '. . . knew or should have known . . .' is determinative of the issue before the Court." There is therefore no basis for the Dissent's contention that the Court has remade the case.

¶30    Given the facts before us here, the answer to the question of when Dvorak knew or should have known that she was suffering from an occupational disease is not amenable to a summary determination. Reiff expressly testified that he did not conclude Dvorak had a specific pathological condition until December 2010 and did not conclude she had an occupational disease until March or April 2011, at which time he informed Dvorak and she acted accordingly. However, the WCC did not take this testimony into account when it concluded that "[t]he undisputed facts demonstrate that . . . [Dvorak] knew or should have known that she was suffering from an occupational disease" as early as 2006. If her doctor did not conclude she had an occupational disease until March or April 2011, a material question of fact arises as to when Dvorak—who is not trained in medicine—should have known she was suffering from an occupational disease. This being so, summary judgment on this issue was not appropriate.

## CONCLUSION

¶31    We therefore reverse the entry of summary judgment and remand for a trial to determine when Dvorak knew or should have known she was suffering from an occupational disease.

/S/ PATRICIA COTTER

12

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

Justice Rice, dissenting.

¶32 In my view, the Court has deftly remade the case. It determines an issue that is neither raised by Dvorak nor contested by the parties.

¶33 The Court states the issue to be decided by the WCC and this Court is simply "when Dvorak knew or should have known that she was suffering from an occupational disease." Opinion, ¶¶ 20, 29. The Court reasons that this issue is "not amenable to summary determination," reversing the WCC and remanding. Opinion, ¶ 30.

¶34 To the contrary, the issue actually raised, as stated by Dvorak, is whether her "claim for occupational disease benefits was barred by the statute of limitations when she was working up to ten (10) days before she filed her claim and her treating physician opined that *her work within the last year of her employment was the major contributing cause of her condition*." (Emphasis added.) In her briefing, Dvorak makes admissions that contradict the Court's reasoning: Dvorak *concedes* she knew she was suffering, not just from "a work-related strain or injury," Opinion, ¶ 25, but from an occupational disease, since February 2006. Her First Report of Injury explained that she had suffered from a "repetitive motion" back and shoulder condition since that date. Dvorak explains her legal position as being that Dr. Reiff determined she had "reached maximum medical

13

improvement for any injury or occupational disease to her cervical or thoracic spine she may have suffered in February 2006 significantly before October 2010," and she argues that she "suffered an *aggravation of her pre-existing condition* by her ongoing work activities within a year of her filing and hence suffered *a new compensable occupational disease* which was timely filed." (Emphasis added.) Thus, the issue Dvorak has raised is whether she sustained a new occupational disease that was distinct from her earlier disease, thereby initiating a new one-year statutory filing period. The parties do not contest that Dvorak knew she had suffered from a prior condition that was actionable—the question is whether something new occurred to trigger a separate and additional filing period. While I wish it was so, this case is not as straightforward as the Court has stated it to be.

¶35 Dvorak posits that she sustained an aggravation of her previously-acknowledged condition that constitutes a new claim. She contends that her work did not become the "major contributing cause" of her current condition until October of 2011, citing the definition of that term in § 39-71-407(9), MCA, which determines the work-relatedness of a disease. However, as the WCC correctly analyzed, the problem with Dvorak's legal position "is that the major contributing cause analysis goes to whether a condition is compensable as an occupational disease—not whether a worker knew or should have known that she is suffering from an occupational disease." A further problem is that the evidentiary record simply does not support Dvorak's claim that she suffered a new occupational disease.

14

¶36 The WCC was careful to emphasize that "awareness of pain, and awareness that the pain is a result of work" does not alone constitute the necessary knowledge that a worker suffers from an occupational disease. Such requisite knowledge, the court explained, "must mean something more than suffering mere pain, but indicate something more significant, such as a condition requiring medical diagnosis and treatment." Clearly, Dvorak had an abundance of such knowledge. As the WCC explained:

> The undisputed facts demonstrate that although she may not have had a formal diagnosis, Petitioner understood that her condition was caused by "repetitive motion" in her job duties and she received medical treatment, including prescription medication, for approximately five years before she filed her first report of injury or occupational disease. By the time Petitioner began taking prescription medication to alleviate her symptoms, she knew or should have known that she was suffering from an occupational disease. Her claim is therefore untimely . . . .

¶37 The Court discounts the evidence of Dvorak's long term use of narcotic pain medication prescribed by Dr. Reiff. Opinion, ¶ 27. However, the Court overlooks the symbiotic correlation between the prescription and Dvorak's work. The medication was sought by Dvorak in March-April 2006 for work pain and was prescribed for that sole purpose, more specifically, to alleviate problems Dvorak experienced during what she described in her deposition as the "lunch rush." As the WCC noted, "Dvorak testified that the only time she experienced pain was while performing overhead activity at work, and that she did not experience pain with other non-work activities." For all the years thereafter, the medication was renewed on a monthly basis for Dvorak's back and shoulder pain, and was increased in strength in January 2009, due to an increase in her work-related symptoms.

¶38 The record demonstrates that Dvorak received a continuing course of medical treatment for a work-related, repetitive motion-caused condition to her back and shoulder that worsened over time, but was the same condition. She did not suffer a new occupational disease.

¶39 I acknowledge the Court's policy concerns about workers who deal with pain during the course of their work, but fail to file a claim. Opinion, ¶ 28. Indeed, it could be questioned whether a one-year statute of limitation has a logical correlation at all to occupational disease claims, which can arise over a long course of time. Of course, it could also be countered that this Court cast that die by striking down the ODA on equal protection grounds for differing from the WCA. *See Stavenjord v. Mont. State Fund*, 2003 MT 67, 314 Mont. 466, 67 P.3d 229. Regardless of this debate, the Court's policy concerns were fully addressed by the WCC when it explained that "awareness of pain, and awareness that the pain is a result of work" is alone insufficient to trigger the requirement to file an occupational disease claim. Here, however, Dvorak experienced and knew much more. The law required her to file a claim years before she did.

¶40 The WCC decided the case that was filed before it based upon the issue raised and the applicable evidence. We should do the same. I would affirm.

/S/ JIM RICE

Justice Laurie McKinnon joins in the dissenting Opinion of Justice Rice.

/S/ LAURIE McKINNON

16