FILED

11/28/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0075

DA 17-0075

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 290

YVONNE WILSON,

        Plaintiff and Appellant,

  v.

RODNEY D. BRANDT, M.D., and FLATHEAD VALLEY
ORTHOPEDIC CENTER, P.C.,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                  In and For the County of Flathead, Cause No. DV 15-938C
                  Honorable Heidi Ulbricht, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                James G. Hunt, Hunt Law Firm, Helena, Montana

        For Appellees:

                Sean Goicoechea, Chris Di Lorenzo, Moore, Cockrell, Goicoechea &
                Johnson, P.C., Kalispell, Montana

Submitted on Briefs:  October 4, 2017

Decided:  November 28, 2017

Filed:

                                      Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Dr. Rodney D. Brandt performed surgery to repair Yvonne Wilson's torn ACL in February 2008. She began to experience new and excruciating knee pain shortly after surgery. On November 5, 2012, Wilson filed a claim with the District Court asserting that Dr. Brandt negligently performed surgery on her knee. The District Court granted summary judgment to Dr. Brandt, holding that Wilson's claim was filed after the three-year statute of limitations had run. Wilson appeals, arguing the District Court erred in concluding as a matter of law that her claims were barred by the applicable statute of limitations. We reverse.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 On October 30, 2007, Wilson twisted her left knee while removing a pool cover at work. An MRI showed a medial meniscus tear of her left knee. Dr. Brandt, an orthopedic surgeon at Flathead Valley Orthopedic Center, P.C. (FVOC), performed a medial meniscus resection on December 13, 2007, to repair the tear. During surgery, Dr. Brandt discovered that Wilson's ACL was partially torn, but did not repair the tear, noting that the chance of needing additional surgery was less than 50 percent. Wilson's symptoms of knee instability and buckling continued, however, and Dr. Brandt performed ACL reconstruction surgery on February 4, 2008. The ACL reconstruction procedure involved drilling a hole through the tibia bone, known as a "tibial tunnel."

¶3 In follow-up appointments from March through May 2008, Dr. Brandt noted that Wilson was "doing absolutely fabulous," "extremely well," and was "approaching maximum medical improvement." His notes after the May 2008 appointment indicate

2

that Wilson was having "some pes anserinus pain." The pes anserinus refers to the area where three tendons insert into the tibia bone located at the inner part of the knee. Dr. Brandt gave her a local injection of cortisone to help ease the pain.

¶4     Contrary to Dr. Brandt's impressions, Wilson testified that in the weeks following surgery, she experienced new and excruciating pain at the site of the tibial tunnel, as well as popping and cracking and continued knee buckling. She testified that during this time she "didn't know" if the "pain . . . was related to the hole that had been drilled in [her] knee," and that she did not ask why she was having the new pain because she had had "two different types of surgeries, one was more aggressive than the other, like the ACL is more aggressive than the meniscus. And so [she] thought it all joined together." During her deposition, in response to the question whether she thought there was something new wrong, she said she was "concerned" and that she "knew there was something wrong" with her knee during this time. In July 2008, Dr. Brandt performed a third knee surgery on Wilson after she fell and reinjured her left knee meniscus.

¶5     Dr. Brandt's notes from a September 2008 appointment state that Wilson was "starting to have some nerve type pain." The notes go on to say that he told Wilson that she would "get better and the nerve pain will burn out." At Wilson's appointment on October 8, 2008, Dr. Brandt noted that Wilson "continue[d] to struggle" and that "I have discussed with the patient that I am really not certain what is going on" and that she was "not within the bell curve of normalcy" for recovery after an ACL surgery. He ordered an MRI to rule out "internal derangement." In his notes reviewing the October 2008 MRI, Dr. Brandt stated that he "continue[d] to diagnose this as complex regional pain

syndrome"—also known as reflex sympathetic dystrophy (RSD)—that "will eventually burn out." Wilson testified that sometime during this period Dr. Brandt told her that RSD developed because "he did too many surgeries in a short period of time."

¶6 Over the next several months, Wilson met with Ann Ingraham, a nurse practitioner at FVOC, and continued to report knee pain to her. On January 13, 2009, Ingraham ordered another MRI to investigate the pain. Upon review of the MRI, Dr. Brandt noted that Wilson continued to report a "significant amount of nerve pain," but he saw "no interval change" since the last MRI. He believed additional surgical intervention would be inappropriate based on what he saw in the MRI. Wilson, meanwhile, continued to report pain to her healthcare providers. After another MRI on June 25, 2009, Dr. Brandt repeated his recommendation that further surgical intervention would be inappropriate. In September 2009, Wilson's workers' compensation insurance stopped authorizing further treatment from FVOC providers. She was referred from FVOC to Montana Center for Wellness & Pain Management on November 3, 2009, to manage her pain.

¶7 In June 2010, providers at the Montana Center referred Wilson to Dr. James Blasingame, an orthopedic surgeon with Northwest Orthopedics and Sports Medicine, for a second opinion about her continuing knee pain. Dr. Blasingame wrote in his notes from her initial appointment that he did not think Wilson had RSD and ordered another MRI. At the July 26, 2010 appointment to discuss the results of the MRI, Dr. Blasingame noted "a somewhat unusual tibial tunnel" and a possible need for surgical intervention. After gathering other opinions, Dr. Blasingame met with Wilson again on September 10, 2010, and recommended surgical intervention to bone graft the tibial tunnel. He noted he was

"unclear as to the exact reason for her knee discomfort. Certainly, the patient's study is quite abnormal with the course of the graft and the subchondral support being compromised by the graft." On December 7, 2010, he noted: "The thought of bone grafting [the tibial tunnel] was an effort to decrease her pain, obviously, but the pain may well be multifactorial as fully outlined in the chart."

¶8 The Montana State Fund sent Wilson to get another opinion from Dr. Michael J. Schutte on January 25, 2011. Upon review of her MRI and medical records, Dr. Schutte noted an "anterior impingement of ACL graft tissue related to aberrant tunnel placement" and suggested a two-stage surgical intervention. Wilson attested in an affidavit: "I did not know that Dr. Brandt messed up my surgery until I met with Dr. Schutte." Dr. Blasingame agreed with Dr. Schutte's recommendation for a two-stage procedure and performed the first stage of the surgical intervention in April 2011.

¶9 On May 7, 2012, Wilson filed her complaint with the Montana Medical Legal Panel (MMLP), claiming that Dr. Brandt negligently performed surgery on her knee on February 4, 2008, by drilling a tibial tunnel in the wrong location. The MMLP issued its decision on August 21, 2012, and Wilson filed her complaint with the District Court on November 5, 2012. Dr. Brandt moved for summary judgment, arguing that Wilson's claims were barred by the three-year statute of limitations contained in § 27-2-205, MCA.

¶10 The District Court reviewed the evidence submitted and held that Wilson discovered the fact that she was injured and tied that injury to Dr. Brandt's ACL surgery

within two months of the February 2008 surgery.[1] The District Court held that the injury was not self-concealing, citing Wilson's testimony that she experienced new pain in the place where she knew Dr. Brandt had drilled a hole in her bone, as well as other new symptoms, shortly after her ACL surgery. The court emphasized further that Wilson said she "knew there was something wrong." The District Court entered summary judgment in favor of Dr. Brandt.

## STANDARD OF REVIEW

¶11 We review a district court's grant of summary judgment de novo. *Dvorak v. Mont. State Fund*, 2013 MT 210, ¶ 15, 371 Mont. 175, 305 P.3d 873. We apply the criteria of M. R. Civ. P. 56(c)(3) to determine whether there is a "genuine issue as to any material fact" and whether "the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3); *see also Dvorak*, ¶ 15. In evaluating a motion for summary judgment, we review the record independently and afford no deference to the district court's decision. *Siebken v. Voderberg*, 2012 MT 291, ¶ 20, 367 Mont. 344, 291 P.3d 572. We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the evidence in favor of the party opposing summary judgment. *Siebken*, ¶ 20.

---

[1] The statute of limitations is tolled from the filing of an application with the MMLP until 30 days after the panel renders its decision. Section 27-6-702, MCA. Wilson's statute of limitations was tolled from May 7, 2012, to August 21, 2012, plus 30 days. Taking this tolled period into account, the applicable three-year statute of limitations for Wilson's complaint filed on November 5, 2012, bars recovery for any injury discovered before June 20, 2009.

**DISCUSSION**

¶12    Wilson argues that the District Court erred in granting summary judgment because the date on which she discovered or reasonably should have discovered her injury involves disputed issues of material fact. She argues that the District Court ignored facts that demonstrate genuine issues for trial, such as Dr. Brandt's diagnosis of RSD to explain her pain. She argues that under *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 136, 345 Mont. 12, 192 P.3d 186, "questions of fact may be determined as a matter of law on summary judgment if 'reasonable minds could reach but one conclusion' on the issue." (quoting *Seeley v. Davis*, 284 Mont. 517, 523, 946 P.2d 119, 122 (1997)). Wilson maintains that reasonable minds could reach different conclusions about when she discovered or reasonably should have discovered her injury.

¶13    Dr. Brandt counters that the statute of limitations begins to run when a plaintiff discovers or through reasonable diligence should discover (1) her injury, and (2) that the injury "may have been caused" by the defendant medical provider. *Wisher v. Higgs*, 257 Mont. 132, 144, 849 P.2d 152, 159 (1993), *overruled on other grounds by Blackburn v. Blue Mt. Women's Clinic*, 286 Mont. 60, 75, 951 P.2d 1, 10 (1997). He argues that the disputed facts that Wilson raises are irrelevant to this determination, because her testimony and the testimony from two of her friends establish that within a few months of her ACL surgery Wilson discovered (1) her injury, and (2) that it may have been caused by Dr. Brandt's actions—more than three years before she filed her claim with the District Court.

7

¶14    Since 1971, the limitations period for medical malpractice has been governed by its own statute, separate from the general statute of limitations for other torts. 1971 Mont. Laws ch. 328, § 1.  In adopting § 27-2-205, MCA, the Legislature codified language from this Court's discovery doctrine case law.  *Compare* 1971 Mont. Laws ch. 328, § 1 (tolling the statute of limitations until "the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury"); *with Johnson v. St. Patrick's Hosp.*, 148 Mont. 125, 132, 417 P.2d 469, 473 (1966) (holding that, when a surgeon negligently leaves a foreign object in a patient's body, the statute of limitations is tolled "until the patient learns of, or in exercise of reasonable care and diligence should have learned of the presence of such foreign object in his body").  Section 27-2-205, MCA (2007)—the statute in effect at the time of Wilson's ACL reconstruction surgery in 2008—provides, in relevant part, that actions for medical malpractice "must . . . be commenced within 3 years after the date of injury *or within 3 years after the plaintiff discovers or through the use of reasonable diligence should have discovered the injury, whichever occurs last*."  (Emphasis added.)[2]

¶15    Our jurisprudence around the medical malpractice statute of limitations borrows both from prior case law and from the general tort statute of limitations. Section 27-2-205, MCA, codified a specific version of the discovery doctrine for medical malpractice cases.  Some of our prior decisions applying § 27-2-205, MCA, rely on cases that are not governed by § 27-2-205, MCA, to interpret the statute.  The parties repeat

_____

[2]  In 2015, the Legislature amended § 27-2-205, MCA, from 3 years to 2 years. *See* 2015 Mont. Laws ch. 368, § 21.

this framework of analysis in their briefing on appeal, discussing at length whether Wilson's injury was "concealed or self-concealing." But when the Legislature amended the general statute of limitations for torts, it adopted different language for the discovery doctrine applicable to torts other than medical malpractice. *See* 1987 Mont. Laws ch. 441, § 1; § 27-2-102(3), MCA. By adopting different statutes, the Legislature has made clear that, for purposes of tolling the statute of limitations, medical malpractice is treated differently from other torts. *See* § 27-2-102(4), MCA ("Subsection (3) [prescribing the discovery doctrine exceptions to the general tort statute of limitations] does not apply to actions involving the limitations contained in 27-2-205 [the medical malpractice statute of limitations]."); *Gregg v. Whitefish City Council*, 2004 MT 262, ¶ 38, 323 Mont. 109, 99 P.3d 151 ("Different language is to be given different construction."). Here, we apply to the facts of this case the language of § 27-2-205, MCA, in the context of the Legislature's adoption of somewhat different language when it later codified the discovery doctrine in § 27-2-102(3), MCA, for all other torts.

¶16 Before the enactment of § 27-2-205, MCA, this Court had adopted the discovery doctrine in medical malpractice cases. *Johnson*, 148 Mont. at 132, 417 P.2d at 473. Under this doctrine, the statute of limitations was tolled "until the patient learns of, or in exercise of reasonable care and diligence should have learned of," his or her injury. *Johnson*, 148 Mont. at 132, 417 P.2d at 473. Making this determination required "look[ing] carefully at the facts of each case presented, for the problems presented in each is how and when the patient discovered the negligence." *Johnson*, 148 Mont. at 128, 417 P.2d at 470. The doctrine was based on equitable considerations of "giving

9

full scope to the statute of limitations on the one hand and according a reasonable measure of justice to the plaintiff on the other." *Grey v. Silver Bow Cnty.*, 149 Mont. 213, 217, 425 P.2d 819, 821 (1967) (quoting *Owens v. White*, 342 F.2d 817, 820 (9th Cir. 1965)). In summing up the development of the discovery doctrine in our early case law, we explained in *Bennett v. Dow Chem. Co.* that the discovery doctrine allowed the statute of limitations to be tolled until a plaintiff discovered that his injury "may have been caused" by the defendant, but not "beyond discovery of the cause of an injury." *Bennett*, 220 Mont. 117, 121, 713 P.2d 992, 995 (1986).

¶17 Between the 1971 enactment of § 27-2-205, MCA, and the 1987 amendment of § 27-2-102, MCA, this Court continued to use and develop the discovery doctrine outside the medical malpractice context. *See, e.g.*, *Bennett*, 220 Mont. at 121-22, 713 P.2d at 995 (discussing application of the discovery doctrine to negligence and products liability claims). During this time, we clarified limitations on use of the discovery doctrine, applying the doctrine only if the injury was self-concealing by its nature or if the defendant concealed the facts of the injury from the injured party. *See Monroe v. Harper*, 164 Mont. 23, 27, 518 P.2d 788, 790 (1974), *overruled on other grounds by Blackburn*, 286 Mont. at 75, 951 P.2d at 10. In 1987, the Legislature incorporated these developments into the general statute of limitations for torts. 1987 Mont. Laws ch. 441, § 1. In enacting these amendments, the Legislature also changed the requirement from discovery of the "injury" to discovery of "the facts constituting the claim," after hearing testimony that this was a better reflection of this Court's discovery doctrine case law. Senate Judiciary Committee Report, January 29, 1987, p. 8. Section 27-2-205, MCA,

10

however, has not been amended to reflect these developments. Despite this, this Court has relied on cases outside medical malpractice without distinction or clarification when called on to interpret the medical malpractice statute of limitations in § 27-2-205, MCA. *See, e.g., Wisher*, 257 Mont. at 140, 849 P.2d at 156-57.

¶18 Although it is not improper for us to look to these developments in the law to aid our interpretation of the statute, we must do so with the role of the judge in mind. When interpreting a statute, it is our role "simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. The plain language of § 27-2-205, MCA, does not call for a separate determination that an injury be "self-concealing" or that the defendant took "action which prevents the injured party from discovering the injury or its cause" in order to toll the statute of limitations. The express exclusion of medical malpractice from the general discovery statute, § 27-2-102(4), MCA, reinforces this. The terms of § 27-2-205, MCA, instead allow the tolling of medical malpractice claims until the time that a plaintiff "discovers or through the use of reasonable diligence should have discovered the injury."

¶19 We have interpreted the statute of limitation provision contained in § 27-2-205, MCA, on three occasions: *Major v. N. Valley Hosp.*, 233 Mont 25, 759 P.2d 153 (1988), *overruled on other grounds by Blackburn*, 286 Mont. at 75, 951 P.2d at 10; *Wisher*, 257 Mont. at 132, 849 P.2d at 152; and *Runstrom v. Allen*, 2008 MT 281, 345 Mont. 314, 191 P.3d 410. In these cases, we have held that the statute of limitations begins to run when a plaintiff discovers or through reasonable diligence should have discovered both

11

(1) the injury; and (2) that the injury "may have been caused" by the defendant medical provider. *Wisher*, 257 Mont. at 144, 849 P.2d at 159; *Major*, 233 Mont. at 30, 759 P.2d at 156. But the statute of limitations is not tolled until a plaintiff discovers her legal right to bring an action for known injuries. *Wisher*, 257 Mont. at 140, 849 P.2d at 157; *Major*, 233 P.2d at 30, 759 P.2d at 156-57. Nor is the statute tolled until a plaintiff "learns the facts out of which a known cause of action arose." *Wisher*, 257 Mont. at 140, 849 P.2d at 157.

¶20 In *Major*, the plaintiff's daughter suffered from a form of lupus, which included episodes of throat swelling and breathing difficulty. *Major*, 233 Mont. at 26-27, 759 P.2d at 154. On the day of her daughter's death in March 1982, the plaintiff called the hospital to inform the staff that her daughter's throat was closing and that she and her daughter were en route from Kalispell to the hospital in Whitefish. *Major*, 233 Mont. at 26, 759 P.2d at 154. Upon their arrival, the hospital staff had not yet called the doctor. *Major*, 233 Mont. at 27, 759 P.2d at 154. The plaintiff's daughter died in the hospital several hours later. *Major*, 233 Mont. at 27, 759 P.2d at 154. The plaintiff consulted with an attorney shortly thereafter, who advised her she should acquire her daughter's medical records. *Major*, 233 Mont. at 27, 759 P.2d at 154. The plaintiff was unable to acquire the records until October 1984. *Major*, 233 Mont. at 27, 759 P.2d at 154. She filed her complaint in April 1985, more than three years after her daughter's death. *Major*, 233 Mont. at 27, 759 P.2d at 154. The district court granted summary judgment on the statute of limitations, and we affirmed. The plaintiff argued on appeal that the statute of limitations should have been tolled until she received the medical records and

12

could thus discover the facts that provided "a causal connection between her daughter's death and the acts, errors, or omissions of her daughter's health care provider." *Major*, 233 Mont. at 30, 759 P.2d at 156. After reviewing the record, we rejected her argument and held that the plaintiff's testimony demonstrated that on the day of her daughter's death, the plaintiff thought her daughter's treatment was inadequate. *Major*, 233 Mont. at 30, 759 P.2d at 156. We held that under the circumstances, her lack of knowledge of the facts contained in the medical record did not prevent her from discovering the injury at issue in the case. *Major*, 233 Mont. at 30, 759 P.2d at 157.

¶21   In *Wisher*, the plaintiff underwent left facial nerve decompression surgery to treat Bell's palsy. *Wisher*, 257 Mont. at 135, 849 P.2d at 153-54. Immediately after surgery she began to have new symptoms of pain, nausea, dizziness, loss of equilibrium, vomiting, and buzzing in her left ear. *Wisher*, 257 Mont. at 135, 849 P.2d at 154. Her surgeon attributed these symptoms to the side effects of anesthesia and a condition called post-operative labyrinthitis. *Wisher*, 257 Mont. at 135, 849 P.2d at 154. The plaintiff's initial symptoms seemed to improve for about two years, but she continued to have problems both related and unrelated to the surgery over the ensuing years. *Wisher*, 257 Mont. at 143, 849 P.2d at 159. Several years and multiple diagnoses later, another doctor discovered that the surgeon had perforated the plaintiff's inner ear during the nerve decompression surgery. *Wisher*, 257 Mont. at 137-38, 849 P.2d at 155. We held that there was no evidence that the plaintiff knew or suspected that she suffered from an injury as a result of her surgery or that she could have discovered this through the use of due diligence. *Wisher*, 257 Mont. at 143-44, 849 P.2d at 159. We relied on *Johnson* and

*Grey*, the cases in which we first enunciated the doctrine of discovery. We distinguished *Major*, holding that in *Major* the wrongful act "was easily identifiable and the injury simultaneous and obvious." *Wisher*, 257 Mont. at 140, 849 P.2d at 157. We held that substantial evidence did not support the jury verdict that the statute of limitations had run. *Wisher*, 257 Mont. at 144, 849 P.2d at 159.

¶22 In *Runstrom*, the plaintiff's sixteen-year-old son broke his femur in an all-terrain vehicle accident and died the next day in the hospital. *Runstrom*, ¶ 7. The day of his son's death, the plaintiff requested an autopsy and confronted the doctor because, "[in t]oday's time, you know, people don't usually die from a broken leg." *Runstrom*, ¶¶ 7, 33. Within weeks, he obtained his son's autopsy report and medical records and consulted with an attorney, but no suit was filed at that time. *Runstrom*, ¶ 7. Four years later, the local paper ran an article reporting on administrative proceedings regarding the doctor. *Runstrom*, ¶ 8. Although his son was not named in the article, the plaintiff believed that his son was one of the unnamed patients discussed in the article. *Runstrom*, ¶ 8. Several months after the newspaper article was published, the plaintiff filed a malpractice suit against the doctor. *Runstrom*, ¶ 9. The plaintiff argued that he did not discover his son's injury until he read the newspaper article. *Runstrom*, ¶ 34. We rejected this argument because the newspaper article contained no new information. *Runstrom*, ¶ 37. The autopsy report and medical records in his possession since shortly after his son's death contained all of the information upon which the plaintiff later based his medical malpractice suit. *Runstrom*, ¶ 37.

14

¶23 Some of these opinions borrowed language from the non-medical malpractice context to interpret the language of § 27-2-205, MCA. But despite those references to terms used in the general tort statute, we conclude that both § 27-2-205, MCA, and our jurisprudence since its enactment accord with our prior medical malpractice case law applying the discovery doctrine when the "patient does not know of his own condition . . . until some time later when he learns of, or in the exercise of reasonable care and diligence he should have learned of it." *Grey*, 149 Mont. at 216, 425 P.2d at 820. As we noted in *Johnson*, this may require "look[ing] carefully at the facts of each case presented." *Johnson*, 148 Mont. at 128, 417 P.2d at 470. Summary judgment is proper only when there is no genuine issue of material fact. *See* M. R. Civ. P. 56(c)(3). When reasonable minds can reach more than one conclusion on the accrual of a plaintiff's claim, a jury may consider the nature of the injury and other surrounding circumstances in resolving the factual dispute over discovery.[3]

¶24 Our de novo review of the record reveals the following material facts:

¶25 Drilling a hole in Wilson's bone was part of the ACL repair. Wilson was informed of this and consented to it. Wilson testified in her deposition that she had new pain after the ACL surgery. Wilson knew that Dr. Brandt drilled a hole in her knee and that she had pain—a common occurrence after a surgery. She "didn't know" if the "pain . . . was related to the hole that had been drilled in [her] knee," in the months after

---

[3] The second sentence of § 27-2-205, MCA, allows tolling "for any period during which there has been a failure to disclose any act, error, or omission upon which an action is based." We held in a prior case that this sentence applies exclusively to toll the five-year statute of repose and does not apply to the statute of limitations. *Blackburn*, 286 Mont. at 75, 951 P.2d at 10. This language is thus inapplicable in the current case.

surgery. She stated she did not ask why she was having the new pain because she had had "two different types of surgeries, one was more aggressive than the other, like the ACL is more aggressive than the meniscus. And so [she] thought it all joined together." When asked whether she thought there was something new wrong, she said she was "concerned" and that she "knew there was something wrong" with her knee during this time. She testified that Dr. Brandt attributed her pain to RSD. Dr. Brandt's records confirm his impression of RSD and his belief that more surgery was not needed. In Wilson's submitted affidavit, she attested that she did not know Dr. Brandt "messed up" until meeting with Dr. Schutte. Even striking any possible hearsay statements from the affidavit, Wilson's claim of her own personal knowledge and impression after her meeting with Dr. Schutte are consistent with her deposition testimony.[4]

¶26   Tammy Munroe, a friend of Wilson, testified in a deposition that she knew about only two of Wilson's six knee surgeries. She testified that a month or two after the ACL surgery Wilson told her that the "ACL just wasn't working, and it hurt her a lot." Munroe said that after the second surgery, when discussing her pain, Wilson "didn't tell me different, but she described it different[ly]" from her pain before the ACL surgery.

¶27   Another of Wilson's friends, Shannon Penney, testified in a deposition on November 10, 2016, about Wilson's knee pain and surgeries. Penney testified that within

---

[4] Dr. Brandt argues that to the extent Wilson relies on her affidavit to argue that she was not aware of her injury until meeting with Dr. Schutte, the affidavit is contrary to her sworn deposition testimony. We disagree. She testified during her deposition that she experienced "new" and "excruciating" pain after her surgery. She did not testify that she recognized that she had been injured or that she believed any new injury may have been caused by Dr. Brandt's actions.

six months to a year after the ACL surgery, Wilson told Penney that "[s]he knew there just wasn't something right with her knee after that surgery, and she'd go to doctors, and then they'd send her to physical therapy. And she would constantly say, you know, There's something wrong. And she'd show me like her knee was indented really weird, just it looked deformed, and it would ache." When asked when Wilson first thought about hiring an attorney, Penney stated "It's—was it four years ago? Five years ago?" When asked how soon after Dr. Brandt's second surgery Wilson considered hiring an attorney, Penney answered that Wilson was in a lot of pain right after surgery, but "I guess I couldn't give you an exact time frame, because I don't know."

¶28    Wilson's medical records show that Wilson continued to report pain to her medical providers, including Dr. Brandt, after the surgery. They show that Dr. Brandt diagnosed Wilson with RSD and concluded that it explained the pain she was having. It was not until Wilson's June 2010 appointment with Dr. Blasingame that Wilson's pain was attributed to something besides RSD or nerve pain that would burn out.

¶29    Upon review of the full record, we conclude that the material facts are not undisputed that, before June 20, 2009, Wilson both recognized that she was injured and that her injuries may have been caused by Dr. Brandt or, alternatively, that through reasonable diligence she should have discovered her injury and its cause. Rather, there is more than one permissible inference that could be made based on Wilson's testimony and medical records. From the evidence, we conclude that the finder of fact reasonably could infer that Wilson discovered her injury and that Dr. Brandt's surgery may have been the cause of that injury soon after the ACL surgery. As in *Major*, it could be inferred that

17

Wilson's lack of knowledge of the facts connecting her pain to the aberrant tibial tunnel did not prevent her or should not have prevented her from discovering the injury at issue because she knew that her pain was new and excruciating. But drawing all reasonable inferences in favor of Wilson as the non-moving party, as required in considering a summary judgment motion, we conclude that the finder of fact alternatively could infer that she knew only that she was having pain from her surgeries, but not that the surgeries had injured her or that any new injury may have been caused by Dr. Brandt's actions. As in *Wisher*, it could be inferred that Wilson did not and could not discover her injury because pain can be expected after surgery and her symptoms were attributed to another cause.

¶30 Thus, more than one inference could be drawn from this evidence about whether Wilson discovered or should have discovered her injury and whether it may have been connected to Dr. Brandt's actions during this time. Objective evidence supports both inferences. Weighing this evidence and determining when Wilson discovered or reasonably should have discovered her injury is an issue for the jury to decide. *See Nelson v. Nelson*, 2002 MT 151, ¶ 24, 310 Mont. 329, 50 P.3d 139 ("The rule in Montana, and in the majority of jurisdictions, is that when there is conflicting evidence as to when a cause of action accrued, the question of whether an action is barred by the statute of limitations is for the jury to decide."). Based on our review of the record, we conclude that there are questions of material fact about when Wilson was aware of—or should have been aware of—sufficient facts to believe she was injured by Dr. Brandt's alleged actions during surgery.

¶31     Just as in *Siebken*, "[w]e reverse the decision of the District Court not because we conclude [Wilson] did file a timely action, but because we conclude the matter should not have been decided on summary judgment." *Siebken*, ¶ 20.  Wilson is entitled to have a jury decide when she discovered or through reasonable diligence should have discovered her injury and that it may have been caused by Dr. Brandt.

## CONCLUSION

¶32     The District Court's order granting summary judgment is reversed and the case is remanded for further proceedings consistent with this Opinion.


/S/ BETH BAKER


We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA